# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | | |
|---|---|---|
| **MELANIE ROSS,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 5:05-cv-13 (HL) |
| | : | |
| **THE CORPORATION OF MERCER** | : | |
| **UNIVERSITY,** | : | |
| | : | |
| Defendant. | : | |

_____

# ORDER

Before the Court are a Motion for Summary Judgment (Doc. 34) filed by Defendant

The Corporation of Mercer University ("Mercer"), a Motion to Strike (Doc. 44) filed by

Plaintiff Melanie Ross ("Ross"), a Motion to Introduce Evidence from Witnesses Not

Previously Identified in Plaintiff's Initial Disclosures (Doc. 45) filed by Ross, and a Motion

to Strike (Doc. 46) filed by Mercer.  For the reasons set forth below, Mercer's Motion for

Summary Judgment (Doc. 34) is granted, Ross's Motion to Strike (Doc. 44) is denied, Ross's

Motion to Introduce Evidence from Witnesses Not Previously Identified in Plaintiff's Initial

Disclosures (Doc. 45) is denied, and Mercer's Motion to Strike (Doc. 46) is denied.

## I.    FACTS[1]

_____

[1] The Court is mindful of its obligation under Rule 56 to construe the record, including all
evidence and factual inferences, in the light most favorable to the nonmoving party and does so
during this recitation of the facts.  Johnson v. Governor of State of Fla., 405 F.3d 1214, 1217 (11th
Cir. 2005) (citation and quotation omitted).  In addition, the Court notes that the facts presented in

## A.    Background

Mercer is an institution of higher learning, and its primary undergraduate campus is located in Macon, Georgia.  In the Fall of 2002, Ross enrolled at Mercer and moved from Columbus, Georgia, to Macon to begin her studies.   (Ross Dep. 8.)  In October of 2002, Ross began a relationship with Daniel Day ("Day"), another Mercer student and a member of the Sigma Alpha Epsilon fraternity ("ΣΑΕ").  (Ross Dep. 62; Day Dep. 35.)  Ross and Day dated for approximately two months—between October and December of 2002—but ended their relationship before Christmas break.  (Ross Dep. 114; Day Dep. 40.)  During their two-month relationship, Ross and Day had consensual sexual intercourse between fifteen and twenty times.  (Ross Dep. 63.)

## B.    Alleged Assault

On the evening of January 8, 2003, Ross and some friends met Day at the house he shared with several roommates.  (Ross Dep. 67-69; Day Dep. 4.)  A group of students, including Ross and Day, then drove to a local bar.  (Ross Dep. 70; Day Dep. 4.)  After arriving at the bar, Ross alleges Day slipped her a date rape drug, took her back to his house, and raped her there later that evening or early the next morning.  (Compl. ¶ 9; Am. Compl. ¶ 9.)[2]  Ross has no memory of any events from shortly after she arrived at the bar until when

this section are necessarily affected by rulings, discussed later in this Order, excluding certain facts from the Court's consideration due to evidentiary problems.

[2] Both the Complaint and the Amended Complaint actually allege that the rape took place "[i]n the early morning hours of January 10, 2003."  (Compl. 1 ¶ 9; Am. Compl. ¶ 9.)  However, during her deposition, Ross admitted to an error regarding the date, and asserted that the incident in question took place "late on the night of January 8th or early on the morning of January 9th."

she awoke the next morning.  (Ross Dep. 93-94.)  Ross asserts that although she has no

memory of having sex with Day, when she awoke she felt pain in her anal area and believed

they had engaged in intercourse.[3]  (Id. 98, 105.)  Later that day, after speaking with a friend,

Kim Rockmore ("Rockmore"), about the previous evening, Ross concluded she had been

raped.  (Id. 106.)  Rockmore and her mother took Ross to a local hospital that evening around

11:00 p.m., where Ross was tested for drugs and a rape kit was administered.  (Id. 110, 112.)

Ross admits no toxicology reports exist showing she was ever given any date rape drugs.  (Id.

54).

### C.     Mercer's Investigation[4]

Priscilla Danheiser ("Danheiser"), Mercer's Interim Dean of Student Affairs, Jim

Flader ("Flader"),[5] Mercer's Director of Residential and Judicial Affairs, and Horace

---

(Ross Dep. 120-21.)  During his own deposition, Day agreed that the relevant time frame was
between January 8-9, 2003.  (Day Dep. 3-4.)

[3] Day admits to having intercourse with Ross, but insists it was consensual and vaginal.  (Day
Dep. 23.)

[4] Two primary points of contention in this case involve (1) whether Mercer took any steps
at all to investigate Ross's allegations and (2) whether Mercer's response, whatever it may have
been, was adequate under the Title IX rubric.  Both Ross and her father, Dan Ross, insist that they
were not informed that Mercer conducted an investigation, nor were they ever made aware of the
outcome of any investigation.  (Ross Aff. ¶ 9; Dan Ross Aff. ¶ 11.)  Ross goes even further, in her
Statement of Undisputed Material Facts, and denies that Mercer investigated the incident at all.
(Doc. 41 at 3, ¶ 14.)  However, the evidence presented to oppose a motion for summary judgment
must consist of more than mere conclusory allegations.  See Avirgan v. Hull, 932 F.2d 1572, 1577
(11th Cir. 1991).  While Ross's challenge regarding whether Mercer's investigation was an adequate
response to her allegations is properly before the Court, based on the evidence submitted by Mercer,
it is clear that at least some investigation took place.

[5] The parties spell this individual's last name differently: Ross spells it "Flater" while Mercer
spells it "Flader."  The Court will assume that Mercer has spelled its employee's name correctly and

Fleming ("Fleming"), Mercer's Executive Vice-President and Provost, were all notified about the alleged attack within a day or two of its occurrence. (Danheiser Aff. ¶¶ 3-5.) At this point, Mercer began its investigation into the allegations. Immediately upon hearing about the alleged assault, Danheiser contacted the Chief of Mercer Police, Gary Collins ("Collins"), to begin an investigation.[6] (Id. ¶ 6.) Danheiser also investigated the matter, meeting with Ross's father, Dan Ross, and Ross. (Id. ¶¶ 9, 15.) It is unclear whether Danheiser ever met with Day or other members of ΣAE. Although Danheiser said that she "went to the house to talk with Daniel Day and other members regarding [Ross's] allegations of sexual assault" (id. ¶ 13), she does not say she actually spoke with anyone there or, if she did, what they said. Day claims he never heard from Mercer about the incident. (Day Dep. 29.)[7]

### D. Mercer's Meetings with Dan Ross

One week after the alleged assault, Dan Ross visited Mercer and met with a number of Mercer officials individually to discuss Ross's allegations and Mercer's response. (Ross Dep. 128.) The officials Dan Ross met with included Danheiser, Fleming and Emory Dunn

---

will use "Flader" in this Order.

[6] Mercer submitted additional information detailing the steps Collins allegedly took in his investigation, but the Court will not consider this information for the reasons set forth in Sections IV(A)(1)(a) and IV(A)(1)(b).

[7] In his deposition, Day does indicate that he went, on his own initiative, to speak with the Mercer Police when he heard from friends that Ross had claimed he raped her. (Day Dep. 28.) Day further testified that he later called and spoke with the Chief of Mercer Police, Gary Collins, about the status of the investigation. (Day Dep. 29.)

("Dunn"), the $\Sigma AE$ advisor. (Danheiser Aff. ¶ 9; Dan Ross Aff. ¶ 7.) The contents of these conversations are largely uncontroverted. Dan Ross contends he provided Danheiser with the names of two other women who allegedly had been sexually assaulted by $\Sigma AE$ members, asked that she speak with them, and told her he believed Mercer needed to address the serious problem posed by $\Sigma AE$. (Dan Ross Aff. ¶¶ 7, 9.) Dan Ross also says he told Dunn that he believed there was a real problem with $\Sigma AE$. (Id. ¶ 7.) Dan Ross additionally asked to meet with the President of Mercer, but this request was denied. (Id. ¶ 8.)

However, one component of Dan Ross's conversation with Danheiser is disputed. The parties disagree about whether Dan Ross asked Mercer officials not to interview Day or other $\Sigma AE$ members. According to Mercer, Dan Ross requested that Mercer not conduct these interviews because he wanted to wait for the Macon police investigation to conclude before deciding whether to proceed with Mercer's student disciplinary process. (Danheiser Aff. ¶ 9.) Dan Ross contends, however, that the Macon Police had told him to ask the school to wait until the police had an opportunity to investigate. Dan Ross states he merely relayed this information to Mercer without expressing any personal opinion or making any similar requests himself. (Dan Ross Aff. ¶¶ 5-6.)[8]

### E.     Mercer's Internal Judicial Proceedings

Ross also met with Danheiser and informed her that she had no memory of the

---

[8] A question of hearsay arises here. While Dan Ross may state what he told Danheiser, he may not state what the Macon police told him, as that would be hearsay. Accordingly, the Court will not consider that the Macon police gave Dan Ross any message to convey to Mercer, for the reasons more fully set forth in Section IV(B)(1)(a).

evening, but that she had awakened in Day's bed the next morning feeling violated. (Danheiser Aff. ¶ 15.) When Danheiser and Ross met, Danheiser requested that Ross write out a statement detailing the alleged incident "so that the school would have an official complaint to proceed with the judicial process." (Id. ¶ 19.) On February 19, 2003, Ross e-mailed Flader an approximately one-page e-mail that detailed what she remembered from the evening of January 8th and concluded, "I have decided to press charges hoping to prevent any more such incidents." (Ross Dep. Ex. 1.) The parties vehemently disagree about what happened next.

Mercer alleges it conducted as complete an investigation as it could, but that it was unable to pursue a formal judicial inquiry in large part because Ross failed to submit a sufficiently detailed complaint.[9] Mercer further contends that, despite its best efforts to secure the additional information from Ross necessary to pursue her allegations, she never submitted the requested documentation. (Danheiser Aff. ¶ 23.) Ross's failure to cooperate with Mercer's attempts to investigate her case allegedly contributed to Mercer's conclusion that there was insufficient evidence to proceed with formal internal judicial proceedings. (Id.)

Ross tells a far different story. Ross alleges she went through all of the steps to have a judicial hearing, including meeting with Flader twice, submitting a written statement in

---

[9] Mercer attempted to introduce evidence that both Flader and Robert Knott ("Knott"), Coordinator of Judicial Education, Residential and Judicial Affairs, followed up with Ross regarding the e-mail in an attempt to obtain a more detailed report. (Danheiser Aff. ¶¶ 20-23.) However, for the reasons set forth more fully in Sections IV(A)(1)(c), IV(A)(1)(d) and IV(A)(1)(e), the Court will not consider this information in ruling on Mercer's Motion for Summary Judgment.

which she expressed her interest in pressing charges, and revising and resubmitting that statement. (Ross Dep. 128-130.) Ross alleges she understood she was to hear from Mercer regarding the proceeding, but she never heard from Flader or anyone else at Mercer again. (Id. 130, 209.) Ross claims she did not contact Mercer concerning the lack of progress because she was afraid of having to sit in the same room as Day during the proceedings. (Id. at 130.) Eventually, Ross concluded Mercer had "just brushed it under the rug." (Id. at 209.)

### F. Aftermath

Both Dan Ross and Ross asked that Mercer move Ross to different housing, and Mercer did so within two weeks of the alleged attack. (Danheiser Aff. ¶¶ 9, 16, 17; Ross Dep. 212-13.) Ross was also referred to a Mercer counselor (Danheiser Aff. ¶ 18), and she saw the counselor a number of times for posttraumatic stress disorder, depression and suicidal ideation (Ross Dep. 18, 169-70, 180). Ross alleges these emotional struggles and paranoia occurred as a result of the alleged incident with Day, and that she remained terrified of him and sought to avoid running into him. (Id. 152-54.)

Ross only saw Day once after the alleged attack, when they passed each other on the road while driving separate vehicles. (Id. 151-52.) Ross was unsure whether Day saw her, and neither acknowledged the other's presence. (Id.) Ross did, however, allegedly have one particularly unpleasant encounter with a member of $\Sigma AE$, Matt Kathy ("Kathy"). Allegedly, Ross and Rockmore gave a girlfriend a ride home from a bar one night, and Kathy got in the car for a ride as well. (Id. at 156.) Ross testifies that after Rockmore dropped her off at her dorm, Kathy later came back to her house, and then stayed outside, throwing things at her

window, yelling at her, and leaving messages on her answering machine. (Id. at 156, 158-59.) Other than the one sighting of Day and the abuse from Kathy, however, Ross admits she had no contact with any other ΣAE members after the alleged attack—not only did they not harass her, but they refused to speak to her at all. (Id. at 174-75.)

Ross contends that, as the Spring semester continued, she skipped a number of classes, stopped eating because she did not want to go to the cafeteria and eventually dropped one class altogether.[10] (Id. 165, 168, 187.) After completing her spring semester, Ross left Mercer and transferred to another school. (Id. 9, 17, 215.) Ross alleges her decision to transfer was because she no longer felt safe at Mercer, she felt like she was constantly being judged, and Mercer made her feel like she was a criminal. (Id. 17, 171, 214.)

## II. PROCEDURAL HISTORY

Ross filed a ten-count lawsuit on January 11, 2005, seeking damages from two defendants—Mercer and "Psi Georgia, LLC, D/B/A The Georgia Psi Chapter of Sigma Alpha Epsilon" ("ΣAE"). Upon joint motion by all parties, ΣAE was dismissed without prejudice, and the Court dismissed Counts Eight and Nine of Ross's Complaint, which alleged liability solely against ΣAE. As a result, eight claims against Mercer remain. Count One alleges a general violation of Title IX of the Education Act and Hostile Environment Based on Sex ("Title IX") for Mercer's failure to adequately respond to Ross's sexual assault

___

[10] Even though Ross's Statement of Material Facts alleges "Ross dropped three of her classes after the incident" (Doc. 41 at 41, ¶ 166), she actually stated during her deposition that she "dropped all *but* three of my classes" (Ross Dep. 165) (emphasis added).

complaint. (Am. Compl. ¶¶ 17-30.) Count Two is styled as "Title IX Against Mercer University for Deliberate Indifference." (Id. ¶¶ 31-45.) Count Three alleges Mercer's inaction and intimidation constituted retaliation. (Id. ¶¶ 46-50.) Count Four alleges Mercer's inadequate and discriminatory sexual assault investigation and complaint procedures have a disparate impact on women. (Id. ¶¶ 51-65.) Count Five is a demand for damages based on the aforementioned four violations of Title IX. (Id. ¶¶ 66-67.) Count Six alleges Mercer[11] breached its duty to keep premises safe, in violation of O.C.G.A. § 51-3-1. (Id. ¶¶ 68-75.) Count Seven alleges Mercer[12] failed to provide adequate security in violation of O.C.G.A. § 51-3-1. (Id. ¶¶ 76-82.) Count Ten alleges Mercer[13] violated its assumed duty to protect its students from sexual assault and prevent on-campus sexual assaults. (Id. ¶¶ 93-98.)

On February 2, 2006, Mercer filed a Motion for Summary Judgment (Doc. 34). Ross filed a Response (Doc. 40), and Mercer filed a Reply (Doc. 47). Two motions to strike related to the evidence the Court may consider when ruling on the motion for summary

---

[11] Originally, Mercer was not mentioned by name in Count Six, which instead referred to "Defendants." Ross moved the Court to amend the title of this Count to include Mercer, and the Court granted her Motion. (October 31, 2005 Order at 9.) There is no question now that Mercer is clearly implicated in the claim.

[12] Mercer was not mentioned by name in Count Seven of Ross's original Complaint either, which also referred generally to "Defendants." Ross moved the Court to amend the title of this Count to include Mercer, and the Court granted her Motion. (October 31, 2005 Order at 9.) There is no question now that Mercer is clearly implicated in the claim.

[13] Mercer was not specifically mentioned by name in Count Ten of Ross's original Complaint, nor were "Defendants" referenced; instead, allegations were leveled at "Defendant." However, the Court allowed Ross to amend Count Ten to include Mercer after her motion that she be allowed to do so. (October 31, 2005 Order at 10.) There is no question now that Mercer is clearly implicated in the claim.

judgment have also been filed—one by Ross (Doc. 44) and one by Mercer (Doc. 46)—and both motions have been completely briefed. Finally, Ross filed a Motion to Introduce Evidence from Witnesses Not Previously Identified in Plaintiff's Initial Disclosures (Doc. 45), and Mercer filed a Response (Doc. 51).

## III.    APPLICABLE STANDARDS

### A.    Motion for Summary Judgment

Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, a Court must evaluate all evidence and make any logical inferences in the light most favorable to the nonmoving party. Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1560 (11th Cir. 1995).

"[T]he plain language of [Federal Rule of Civil Procedure] 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The movant carries the initial burden and must meet this burden "by 'showing'--that is, pointing out to the district court--that there is an

absence of evidence to support the nonmoving party's case." Id. at 325. "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The nonmoving party is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. The nonmoving party must put forth more than a "mere scintilla of evidence." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). "[T]here must be enough of a showing that the jury could reasonably find for that party." Id. This evidence must consist of more than mere conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Thus, under Rule 56, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

**B.      Motion to Strike**

Federal Rule of Civil Procedure 12(f) sets forth the standard for motions to strike. "Upon motion made by a party before responding to a pleading . . . the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The Federal Rules of Civil Procedure identify "pleadings" as complaints, answers and replies to counterclaims. Fed. R.

Civ. P. 7(a). Nonetheless, it is common for parties to file motions to strike directed at matters that are not contained in the pleadings. It is equally common for courts that receive such improperly targeted motions to strike to promptly deny them, irrespective of their underlying merit. See, e.g., Putnal v. Guardian Life Ins. Co. of Am., No. 5:04-cv-130, 2006 WL 2850424, at *3 (M.D. Ga. Sept. 29, 2006) ("the preferred method for challenging a defective affidavit is to file a notice of objection to the challenged portion of the affidavit"); Newsome v. Webster, 843 F. Supp. 1460, 1464 (S.D. Ga. 1994) (noting the United States District Court for the Southern District of Georgia does not entertain motions to strike affidavits supporting or opposing motions for summary judgment); Morgan v. Sears, Roebuck & Co., 700 F. Supp. 1574, 1576 (N.D. Ga. 1988) (noting the United States District Court for the Northern District of Georgia does not entertain motions to strike affidavits supporting or opposing motions for summary judgment). Although these courts deny the motions to strike, the same courts generally treat the motions to strike as objections to the challenged portions of the affidavits. Putnal, 2006 WL 2850424, at *3.

C. **Motion to Introduce Evidence from Witnesses Not Previously Identified in Plaintiff's Initial Disclosures**

Respecting initial disclosures, the Federal Rule of Civil Procedure 26 provides, in pertinent part:

[e]xcept in categories of proceedings specified in Rule 26(a)(1)(E), or to the extent otherwise stipulated or directed by order, a party must, without awaiting a discovery request, provide to other parties: (A) the name . . . of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment.

Fed. R. Civ. P. 26(a)(1)(A). Parties are also under a duty to supplement or correct

their Rule 26 disclosures at appropriate intervals. Fed. R. Civ. P. 26(e)(1). Federal Rule of Civil Procedure 37(c)(1) prohibits parties who fail to satisfy these disclosure and supplementation requirements without "substantial justification" from using the undisclosed evidence "at trial, at a hearing, or on a motion," unless the failure is "harmless." Fed. R. Civ. P. 37(c)(1).

## IV.   ANALYSIS: PROPER EVIDENCE FOR THE COURT TO CONSIDER

As the parties' Motions to Strike and Motion to Introduce Evidence from Witnesses Not Previously Identified in Plaintiff's Initial Disclosures all address what evidence the Court may properly consider on summary judgment, they will be analyzed first. As mentioned previously, a motion to strike is only appropriately directed towards matters contained in the pleadings. Neither of the Motions to Strike addresses matters contained in the pleadings. In view of the forgoing, both of these Motions are denied. Nonetheless, both parties correctly assert that the Court may only consider admissible evidence when deciding a motion for summary judgment. Therefore, the Court will construe the parties' Motions to Strike as evidentiary objections and explicitly rule upon the objections contained within them, as well as upon the Motion to Introduce Evidence from Witnesses Not Previously Identified in Plaintiff's Initial Disclosures, before it turns its attention to the underlying Motion for Summary Judgment.

### A.   Ross's Motion to Strike

Ross filed a Motion to Strike (Doc. 44) contending that portions of three exhibits attached to Mercer's Motion for Summary Judgment cannot be considered by the Court in

support of the summary judgment motion. First, Ross argues that paragraphs 11, 12, 14, 20, 21, 22 and 23 of Exhibit A, Danheiser's Affidavit, are based on hearsay. (Id. at 1, 2-4.) Second, Ross posits that Exhibit B, in its entirety, should not be considered by the Court because it contains purported records from the Georgia Bureau of Investigations ("GBI") that have not been authenticated. (Id. at 2, 5.) Third, Ross contends that Exhibit C, which consists of Ross's purported academic records from Mercer, also cannot be considered due to a lack of authentication. (Id.) Mercer filed a Response (Doc. 50). Ross failed to file a Reply .

### 1. Danheiser's Affidavit

Ross argues that seven paragraphs of Danheiser's Affidavit contain inadmissible hearsay and are not based on personal knowledge. (Doc. 44 at 1, 2-4.)

### a. Paragraph 11

Paragraph 11 contains two sentences: "Chief Collins interviewed Daniel Day and males who [sic] he listed as a [sic] potential witnesses to the events. Daniel denied all allegations, and stated that he and the plaintiff had had consensual sex as usual on the night in question." (Danheiser Aff. ¶ 11.) Mercer responds to Ross's allegation that the two sentences are hearsay by arguing the first sentence contains no statements, only Danheiser's personal knowledge of the investigation, and that while the second sentence is admittedly hearsay, the information it conveys is contained elsewhere in the record.

The first sentence is hearsay. Even though Danheiser did not say "Chief Collins told me that he interviewed Daniel Day and males whom he listed as potential witnesses to the

14

events," that is essentially what Danheiser has sworn. The only two ways Danheiser could know Collins conducted these interviews, as she admittedly was not present for them, would be if someone orally told her about the interviews or if she read a written report that said the same. Either way, the statement that informed her about the interview would be hearsay. Mercer could have submitted an affidavit from Collins stating that he had conducted these interviews, but it did not. While Mercer might have been able to produce Collins to testify to these facts at trial, the Court cannot consider inadmissible hearsay at the summary judgment stage. This hearsay is inadmissible because it does not fall into any exception—it is not a party admission, and it is being submitted to prove the truth of the matter. Nonetheless, at least the information that Collins and Day spoke is a fact the Court may consider, since Day mentioned this talk in his deposition. (Day Dep. 28-29.)

The second sentence contains two statements of Day's: (1) that he denied Ross's allegations and (2) that the sex on the night in question was consensual. These statements are hearsay, but given that both pieces of information are contained elsewhere throughout the record, including in Day's sworn deposition (Id. 4, 15-16, 21), the Court will consider this information when ruling on Mercer's Motion for Summary Judgment.

### b.     Paragraphs 12 and 14

Paragraphs 12 and 14, like the first sentence in paragraph 11, are inadmissible. Although these statements contain no explicit statements by third parties, they contain information regarding Collins's purported investigation into Ross's allegations: that Collins followed up with the Macon Police Department, received copies of various reports

15

and interviews, and investigated the incident independently. Mercer's argument that these paragraphs reflect Danheiser's personal knowledge of Mercer's investigation as it relates to Collins' actions is, again, unavailing. Mercer could have submitted an affidavit from Collins with this same information, but it may not rely on hearsay from Danheiser to introduce evidence on the matter. All of the information in these paragraphs, with the exception of the fact that the Macon Police never arrested Day,[14] is inadmissible.

### c.    Paragraph 20

Paragraph 20 states "Jim M. Flader, Mercer's Director of Residential and Judicial Affairs, followed-up with Melanie regarding her written statement and requested that she speak with Mr. Robert Knott, Coordinator of Judicial Education, Residential and Judicial Affairs, regarding the school's judicial process." Danheiser's comments on the actions and statements of Flader are no less hearsay than those regarding Collins. The paragraph consists of pure hearsay and will not be considered by the Court when ruling on Mercer's Motion for Summary Judgment.[15] In addition, the Court rejects Mercer's argument in favor of admitting the information contained in this paragraph—that "the underlying fact that plaintiff was informed to speak with school officials regarding the school's judicial process is admissible, as a party admission." (Doc. 50 at 5.) Mercer cites to Ross's

---

[14] This fact is found in Day's deposition, during which he testified that, after he spoke with Collins, "it was just kind of a dead thing. I just waited and nothing happened." (Day Dep. 29.)

[15] Mercer admits the portion of paragraph 20 beginning with and including the word "requested" is hearsay and accepts that "the statement may be stricken from Ms. Danheiser's affidavit." (Doc. 50 at 5.)

deposition after making this assertion, but the portion of her deposition to which Mercer directs the Court's attention, pages 128-130, never mentions Knott. In summary, the Court accepts that Ross and Flader met, recognizes the discussions during and outcome of these meetings are points of serious contention, but holds Mercer cannot use Danheiser's affidavit to present what Flader said or did.

### d. Paragraph 21

The section of paragraph 21 at issue states "Mr. Flader continually followed-up with Melanie regarding a written complaint. Finally, on February 19, 2003, Melanie sent an e-mail to Mr. Flader, which provided a vague description of her allegations." This section contains hearsay but the facts contained within it are largely admissible through Ross's deposition. The fact that Flader and Ross spoke is reflected in Ross's deposition, and the e-mail sent by Ross to Flader on February 19, 2003 (Ross Dep. Ex. 1) has been sworn to and verified under oath. In addition, Ross confirmed in her sworn deposition that she and Flader spoke and that she sent him an e-mail detailing her allegations. (Ross Dep. 129-30, 199-200.) However, to the extent the paragraph can be said to establish that Flader "continually followed-up with Melanie," the Court will not construe it as reflecting any greater effort on Flader's behalf than what is reflected in Ross's deposition—that Flader and Ross spoke at least twice and their conversations involved Ross sending Flader an e-mail regarding the alleged attack. Mercer chose to omit an affidavit from Flader and must abide by the consequences of that decision. Hearsay from Danheiser to establish what Flader did, when Flader's own testimony was available, is inadmissible.

### e. Paragraph 22

Paragraph 22 states: "Although Mr. Knott repeatedly contacted Melanie regarding her February 19th e-mail, Melanie did not speak with Mr. Knott until March 7, 2003. At this meeting, Mr. Knott explained the judicial process to Melanie and requested that she write a more detailed report. Melanie never did so." The entirety of paragraph 22 is hearsay and inadmissible.[16] Instead of trying to get Danheiser to testify on behalf of Collins and Flader, Mercer is now attempting to have her testify on Knott's behalf. If Mercer wanted the Court to consider what Knott did and said, it should have submitted an affidavit from him. Again, Mercer's attempt to direct the Court to Ross's deposition to prove the facts underlying Danheiser's account is self-defeating. Mercer argues Ross "admitted the underlying facts contained therein - that the judicial process was explained to her and that she was requested to write a more detailed statement." (Doc. 50 at 6.) However, while Ross's deposition does reflect that she provided a written statement, the pages Mercer cited show that the statement was provided to Flader, not Knott, and that while Ross apparently revised the statement, it offers no explanation as to why or how the statement was revised. (Ross Dep. 199-201.)

### f. Paragraph 23

Paragraph 23 concludes that "Given the lack of evidence substantiating

---

[16] Mercer admits the portion of paragraph 22 wherein Knott "requested that [Ross] write a more detailed report" is hearsay and accepts that "the statement may be stricken from Ms. Danheiser's affidavit." (Doc. 50 at 6.)

plaintiff's allegations, plaintiff's and her father's persistence that Mercer not conduct a full judicial procedure until they advise otherwise, plaintiff's lack of cooperation in codifying her allegations, lack of physical evidence substantiating plaintiff's allegations, and Daniel Day's and several witnesses['] statements refuting plaintiff's allegations, Mercer determined that there was insufficient evidence to proceed with formal school judicial proceedings." Paragraph 23 does not contain any hearsay as it contains no statements and it reflects Danheiser's personal knowledge of the rationale underlying Mercer's decision to not pursue a formal school judicial proceeding. It is proper for Danheiser to testify about why Mercer ended its investigation, because she was integral in making that decision, and her stated reasons for the decision are not being admitted for the truth of the underlying matters asserted, but rather for the fact that Mercer based its decision on such beliefs.[17] The paragraph is admissible.

## 2. GBI Report

Ross argues Exhibit B, in its entirety, should not be considered by the Court because it contains purported GBI records that have not been authenticated. (Doc. 44 at 2, 5.) Mercer, in response, offers two arguments for the documents' authenticity: (1) the documents are self-authenticating, per Rule 902(1) (Doc. 50 at 7-8); or (2) the documents are admissible under the residual hearsay exception, Rule 807 (id. at 8-9). Mercer also contends Ross admitted the underlying facts in the report are true, and therefore the Court should

---

[17] To be clear, the Court is not accepting Danheiser's statements as proving the truth of the matters asserted therein, but rather as her explanation of Mercer's course of conduct.

consider the findings regardless of the documents' admissibility.  (Id. at 9.)

Federal Rule of Evidence 901 provides that authentication of an exhibit is a condition precedent to its admissibility.  Fed. R. Evid. 901(a).  Under Rule 902(1), a document bearing the seal of a state and a signature purporting to attest or execute the document is self-authenticating.  Fed. R. Evid. 902(1).  However no seals were attached to the documents here.  Instead, the documents bore copies of seals.  Therefore, the documents are inadmissible under 902(1).  See, e.g., United States v. Hampton, 464 F.3d 687, 689 (7th Cir. 2006) ("The rationale of Rule 902(1), according to the Committee Notes, is that a seal is difficult to forge.  But that is not true of a copy of a seal . . . .") (citation omitted).

Federal Rule of Evidence 807, the "residual" exception, allows statements not specifically covered by Rule 803 or 804, but having equivalent circumstantial guarantees of trustworthiness, to be admitted.  Fed. R. Evid. 807.  However, by its express terms, Rule 807 only applies to statements the likes of those discussed in Rule 803 and 804.  It does not apply to self-authenticating documents.  "Rule 902 contains no catch-all or residual provision, such as that set forth in Fed.R.Evid. 807 for hearsay exceptions; in order for [a] publication to qualify as a self-authenticating document, it must fit within the express provisions of the rule."  Goguen ex. rel Goguen v. Textron Inc., 234 F.R.D. 13, 17 (D. Mass. 2006) ("There is little chance the document is a forgery . . . .  However, the rule does not permit self-authentication in all cases where the risk of forgery is slight; rather, it exempts a small number of specific kinds of documents from the general authentication requirement.")  Here, Mercer has made no showing that the documents fit within any of the express provisions of

Rule 902.[18]

Mercer's third argument is that, because Ross has admitted the facts contained in the documents, they should be considered by the Court. This contention is true, in part. Mercer submitted three alleged GBI Reports in its Exhibit B: the first dealt with a toxicology report for recreational drugs,[19] the second contained the results of Ross's sexual assault evidence kit, and the third was the poison determination dealing with whether Ross had been given a date rape drug. In her deposition, Ross admitted that she had no test results demonstrating she was ever given a date-rape drug, and she was aware of the existence of no such test results. (Ross Dep. 54.) Therefore, the Court accepts that Ross has produced no evidence to prove she was given any date-rape drugs. However, the Court will not consider the actual GBI reports attached here, nor will it consider the results of the other two reports dealing with the presence, or lack thereof, of recreational drugs or seminal fluid.

### 3. Academic Transcript

Ross also argues Exhibit C, her unauthenticated academic transcript, should not be considered by the Court in support of Mercer's Motion for Summary Judgment. (Doc. 44 at 2, 5.) In response, Mercer argues official college transcripts, such as the one here, are

---

[18] Mercer also could have attempted to show the self-authentication of the documents by way of Rule 902(4), but this attempt would also have failed. Rule 902(4) provides that copies of official reports are self-authenticating if certified as an accurate copy either by the custodian of the original record by someone else authorized to certify its accuracy. Fed. R. Evid. 902(4). Because Mercer submitted no certification by anyone, the documents are not self-authenticating under Rule 902(4).

[19] The "recreational drugs" this report allegedly tested for were opioids, amphetamines, barbiturates, cannabinoids (marijuana), certain benzodiazepines, and cocaine/cocaine metabolites. (Mot. Summ. J., Ex. B at 2.)

so inherently trustworthy that they qualify as self-authenticating documents under Rule 901 and 902 and are exceptions to hearsay under the residual exception of Rule 807. Mercer also presents a case from the former Fifth Circuit which it says is binding upon this Court,[20] in which a college transcript was found to be properly self-authenticating and thus admissible. See United States v. Hitsman, 604 F.2d 443, 447 (5th Cir. 1979).

Two of Mercer's arguments, which mirror those it made regarding the GBI reports, are rejected on similar grounds. This copy of an official transcript is not self-authenticating, as it bears merely a copy of a seal, not an actual seal.[21] Likewise, Mercer cannot rely on Rule 807 to excuse its laziness.[22] Mercer could have easily secured an original version of Ross's transcript or provided an employee affidavit to establish the transcript's validity. Finally, the

---

[20] The United States Court of Appeals for the Eleventh Circuit has adopted the case law of the former Fifth Circuit handed down as of September 30, 1981, as its governing body of precedent. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc). This body of precedent is binding unless and until overruled by the Eleventh Circuit en banc. Id.

[21] It is ironic that Mercer would argue this document copy is self-authenticating or, in other words, just as reliable as the original itself. After all, the border of the document reads "TO VERIFY: TRANSLUCENT GLOBE ICONS MUST BE VISIBLE WHEN HELD TOWARD A LIGHT SOURCE." (Mot. Summ. J., Ex. C.) Of course, since the document is only a facsimile of the original, no globes, translucent or otherwise, are visible when the transcript is held towards a light source.

[22] Other courts who have examined the legislative history of the residual hearsay exceptions have concluded that "these residual hearsay exceptions were designed to facilitate the admission of hearsay in situations unanticipated by the other exceptions, but involving equal guarantees of trustworthiness" and that "it was intended by Congress that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances." Munafo v. Metro. Transp. Auth., Nos. CV-4572 (ERK), 00-CV-0134 (ERK), 2003 WL 21799913, at *29 (E.D.N.Y. Jan. 22, 2003) (quotations and citations omitted). At the very least, common sense dictates that Congress did not intend these exceptions to be used as a short-cut to bypass clear paths to admissibility already in place.

Court rejects Mercer's contention that <u>Hitsman</u> is controlling.  In <u>Hitsman</u>, the former Fifth Circuit found a district court did not err in admitting a defendant's college transcript under Rule 803(24) based on testimony by a government witness who testified to the defendant's personal information contained on the transcript and since "the exhibit had the indicia of being an authentic copy since it bore a seal above the registrar's signature." <u>Id.</u> <u>Hitsman</u> and the instant case are distinguishable on two fronts.  First, the former Fifth Circuit did not announce a sweeping holding that all college transcripts were automatically admissible under the catch-all hearsay exception—it found one district court had not committed an error in allowing such an admission under certain, fact-specific circumstances.  Second, there is no way for the Court to determine whether the seal in question in <u>Hitsman</u> was an actual seal affixed to a copy of a transcript, or exactly what "personal information" about the defendant in <u>Hitsman</u> the government witness corroborated.  In short, the factual circumstances in this case either are, or very well may be, different from the facts in <u>Hitsman</u>; therefore, the Court is not bound by the appellate court's holding in <u>Hitsman</u>.  Accordingly, the Court will not consider Ross's transcript, Exhibit C, when ruling on Mercer's Motion for Summary Judgment.[23]

### B.    Mercer's Motion to Strike

Mercer filed a Motion to Strike (Doc. 46) addressing portions of four exhibits attached

---

[23] Of course, given the Court's holding that Ross's attack does not qualify as pervasive discrimination, the exclusion of her transcript is largely irrelevant—its applicability goes to whether or not Ross was denied educational opportunities, a prong the Court does not reach.

to Ross's Response to Mercer's Motion for Summary Judgment.  First, Mercer argues that the last sentence of paragraph 5, the last sentence of paragraph 7, and the second and last sentences of paragraph 9 of Exhibit 1, Dan Ross's Affidavit, are based on hearsay and cannot be considered by the Court.  (Id. at 2, 3-4.)  Second, Mercer posits that Exhibit 2, the responses of Mercer to the interrogatories of Zenobia Lacabe ("Lacabe"), should not be considered by the Court in their entirety because they were not submitted under oath and are thus unauthenticated.  (Id. at 2, 5-6.)  Third, Mercer contends that Exhibit 3, which consists of Rockmore's Affidavit, cannot be considered at all due to its irrelevance.  (Id. at 2, 4-5.)  Four, Mercer argues the third sentence of paragraph 5 in Exhibit 4, Ross's Affidavit, is hearsay and cannot be considered.  (Id. at 2, 3-4.)  Ross filed a Response (Doc. 62), and Mercer filed a Reply (Doc. 63).

### 1.    Dan Ross's Affidavit

Mercer posits that four sentences contained in Dan Ross's Affidavit contain classic, inadmissibly hearsay, in that they are statements made by someone other than Dan Ross offered to prove the truth of the matter asserted.  Ross offers some specific argument about why each statement is admissible and also offers two additional, general reasons why all of the statements are admissible—that "each statement either is not provided for the truth of the matter or it is a party admission."[24]  (Doc. 62 at 2.)  The Court will address each

---

[24] This vague either/or argument is, of course, not helpful to the Court.  Had Ross taken the time and spent the effort to address which statements fell into each potential hearsay exception, she would have done the Court, and maybe her argument on this matter, a service.

disputed statement in turn.

### a.     Alleged Statements of Macon Police

In the last sentence of paragraph 5, Dan Ross states that during his meeting with the Macon Police "[t]hey had told me to have the school not take any action until they had an opportunity to investigate, and that it would be done quickly." (Dan Ross Aff. ¶ 5.) Mercer argues this statement is classic hearsay, in that it is a comment allegedly made by another person, the Macon Police, offered to prove the truth of the matter asserted—that the Macon Police told Dan Ross to relay this information to Mercer—and that Dan Ross could have submitted an affidavit from the Macon Police regarding its alleged communications. (Doc. 63 at 3-4; Doc. 46 at 4.) Ross responds that because Dan Ross was a party to the conversation with the Macon Police, he should be allowed to relay the content of the communication, as it is based on his personal knowledge.

Mercer is correct. Quite simply, Dan Ross cannot put words in the mouth of the Macon Police and have the Court accept that they were said. As for Ross's two catch-all arguments, first, Ross is offering the statement for the truth of the matter—that the Macon Police told him to convey this specific statement to Mercer—so it is not saved on that basis. Second, the Macon Police are not a party, therefore the statement is not a party admission.

### b.     Alleged Statements of Dunn

In the last sentence of paragraph 7, Dan Ross states "Dunn, the ΣAE advisor, said that they would take no actions against the fraternity." (Dan Ross Aff. ¶ 7.) Again, Mercer argues this statement is classic hearsay (Doc. 46 ¶ 2; Doc. 63 at 3-4) while

Ross responds that this statement is not hearsay because Dan Ross was present and heard Dunn say it (Doc. 62 at 2). Mercer's objection is valid. The statement is hearsay.

It is clear that Ross is trying to use this statement to prove the truth of the matter asserted—that Mercer had decided it would not take any disciplinary action against $\Sigma AE$—thus the statement is inadmissible under this hearsay exception. Ross has also posited that some of these statements are party admissions. Federal Rule of Evidence 801(d)(2)(D) states that an out-of-court statement offered in evidence to prove the truth of the matter attested is not hearsay if "[t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D). Dunn presumably was an employee of the University at the time he allegedly made the statement. However, it is unclear whether, as faculty advisor to $\Sigma AE$, he exercised any degree of influence over whether Mercer would pursue its judicial investigation against Day. Because the Court cannot tell whether Dunn should be considered a party, and because Ross has offered no argument or evidence on this point, the Court is unable to find this hearsay fits within an exception, and the Court will not consider this statement when ruling on Mercer's Motion for Summary Judgment.

### c.   Alleged Statements of Danheiser

Mercer also argues the second and last sentences of paragraph 9 in Dan Ross's affidavit are hearsay. Dan Ross alleges that after he told Danheiser two other girls had been identified as having been sexually assaulted by $\Sigma AE$ members and met with her to

ask whether she had spoken with them, "Danheiser informed me that she had spoken with them and that their allegations were similar to Melanie's. Danheiser said that she would not act unless the students chose to bring the claims themselves." (Dan Ross Aff. ¶ 9.) Again, these statements clearly fit the definition of hearsay and are only admissible if they fit into an exception.

Unlike the previous discussion regarding Dunn, it is clear that Danheiser was an agent of Mercer and that these alleged statements concern a matter within the scope of the agency and made during the existence of the relationship. Danheiser admitted that, as Interim Dean of Student Affairs, she was in charge of ensuring compliance with Mercer's student disciplinary procedures and for the overall administration of student complaints. (Danheiser Aff. ¶ 3.) Therefore, Danheiser clearly exercised influence over Mercer's decision to investigate Ross's allegations and then to terminate that investigation. Therefore, her out-of-court statements are not hearsay, but are admissions of a party-opponent, admissible pursuant to Federal Rule of Evidence 801(d)(2)(D).

Danheiser's statements shall not be granted carte blanche admissibility, however, as the nature of the comments requires further analysis. The statements "Danheiser informed me that she had spoken with them" and "Danheiser said that she would not act unless the students chose to bring the claims themselves" are both out-of-court statements of Danheiser, a party, and the Court will consider them. The statement "their allegations were similar to Melanie's" is double hearsay, and it shall be considered to show that Danheiser relayed this

information to Dan Ross, but not for the truth of the matter asserted.[25]

## 2.    Responses to Interrogatories

Mercer moves to strike the responses to interrogatories of Lacabe as unsworn statements (Doc. 46 at 6), while Ross states she "has found no support for Mercer's position that interrogatory responses must be verified to be used at summary judgment" (Doc. 62 at 3).   The Eleventh Circuit has clearly held that "[u]nsworn statements do not meet the requirements of Fed. Rule Civ. Proc. 56(e) and cannot be considered by a district court in ruling on a summary judgment motion."  <u>Carr v. Tatangelo</u>, 338 F.3d 1259, 1273 n. 26 (11th Cir.  2003) (citation and quotation omitted); <u>see also</u> <u>Owners Ins. Co. v. James</u>, 295 F. Supp. 2d 1354, 1362 (N.D. Ga. 2003) (finding an unverified response to interrogatories filed in a separate action did not meet the requirements of Rule 56(e) and could not be considered by a district court in ruling on a summary judgment motion).   Like the situation in <u>Owners Insurance Co.</u>, Lacabe's responses to interrogatories were filed in a separate action and are not verified.   Accordingly, as an unsworn statement, the responses shall not be considered

---

[25] One additional disagreement between Mercer and Ross regarding the admissibility of these statements deserves clarification by the Court.  In Ross's Statement of Undisputed Material Facts, she repeats what Danheiser allegedly told Dan Ross, then adds, in a footnote, that "The conversation between Danheiser and KK and AB are offered to show that the school was deliberately indifferent by its policy of requiring students, rather than the school, to take steps to remedy harassment, rather than for the truth of the conversations between the two."  (Doc 41 at 32 n. 4.)  In Mercer's Reply In Support of Its Motion to Strike Portions of Plaintiff's Exhibits, Mercer complains that "this contention has no merit because there is no value to support plaintiff's alleged theory of deliberate indifference unless the facts of the conversation are taken for the truth of the matter asserted."  (Doc 63 at 5 n. 1.)  Mercer is correct here—even though Danheiser's conversations may prove Mercer had actual knowledge of two additional claims of sexual harassment, the mere fact that these conversations took place is not evidence that Mercer acted with deliberate indifference to those claims.

by the Court in its ruling on Mercer's Motion for Summary Judgment.

### 3.     Rockmore's Affidavit

Mercer moves to exclude Rockmore's entire affidavit from the Court's consideration because it allegedly contains no facts which are relevant to Ross's Title IX or state law claims. The parties' briefing on this issue reveals a fundamental disagreement about the way in which they view Ross's burden of proof in the case. Ross states that "in order to recover under any of her theories, including Title IX, [she] must prove that she was sexually harassed and/or assaulted . . . . and accordingly, the affidavit is relevant." (Doc. 62 at 3.) Mercer, however, states that "[w]hether or not plaintiff was allegedly harassed or assaulted by Mr. Day has no relevancy to the legal issues contained in the motion for summary judgment and it is of no consequence to their determination because Title IX focuses on Mercer's actions or inaction after plaintiff alleges an assault, and not whether plaintiff was actually assaulted." (Doc. 63 at 6.)

The Supreme Court has emphasized that only "known circumstances" inform what a court can consider when it determines whether a response is "clearly unreasonable" under Title IX. See Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 648 (1999). Accordingly, the proper questions before the Court when considering the admissibility of Rockmore's affidavit is not whether a sexual assault actually occurred, but what circumstances were known by Mercer, and how did those known circumstances color the adequacy of Mercer's response. Here, Ross has offered no evidence to suggest that Rockmore ever relayed any of the information in her affidavit to anyone at Mercer.

Accordingly, the Court shall not consider Rockmore's Affidavit when ruling on Mercer's Motion for Summary Judgment.[26]

### 4. Ross's Affidavit

Mercer also seeks to exclude the statement "The nurse said that I had anal abrasions consistent with forced anal penetration" (Doc. 46 ¶ 2; Doc. 63 at 5-6) as impermissible hearsay. The statement is hearsay and Ross's arguments to the contrary are unavailing—Ross clearly is offering the statement for the truth of the matter asserted and there is no evidence that the nurse could be construed as a party and/or agent of Mercer. The statement will not be considered by the Court.

### C. Motion to Introduce Evidence from Witnesses Not Previously Identified in Plaintiff's Initial Disclosures

### 1. Six Witnesses Mentioned in Motion

Ross filed a Motion to Introduce Evidence from Witnesses Not Previously Identified in Plaintiff's Initial Disclosures (Doc. 45). Ross argues the Court should allow the deposition transcripts of Anna Christine Coley, Barry Jenkins, Steven Brown, Samuel F. Hart, Raymond Golden, and Christy Henry[27] to be admitted into evidence to support Ross's

---

[26] Nonetheless, the majority of the information contained within Rockmore's Affidavit was included elsewhere in the record and is properly before the Court. For example, the facts that Ross and Day went to a bar together on the night in question, that Ross spent the night with Day at his house, and that Ross had no memory the next day about what occurred between herself and Day, are all contained in Ross's Affidavit, and there is evidence she relayed all of this information to Mercer.

[27] These individuals all are or were employees of Mercer and their depositions were taken in Doe v. Mercer University, a Superior Court of Fulton County case, within months of the alleged sexual assault in this case.

claim regarding foreseeability. Ross contends that, while the information contained within the depositions of witnesses identified in the parties' Initial Disclosures is sufficient to support its claim regarding forseeability, the testimony of the aforementioned individuals would bolster that claim. Ross concludes that although the witnesses were not disclosed under Rule 26(a)(1), there is no prejudice to Mercer that would prohibit Ross from using their testimony, since the same attorneys that now represent Mercer in the present action represented Mercer in <u>Doe v. Mercer University</u>, and Mercer had the opportunity to cross examine these witnesses in that case. Finally, Ross offers the deposition transcripts for the impeachment of Mercer's allegations that no evidence exists that it is foreseeable that an acquaintance rape would occur on its campus, and that it is not deliberately indifferent to claims of sexual harassment and assault. By way of opposition, Mercer filed a Response (Doc. 51) that opposes admitting the proffered depositions because (1) they are needlessly cumulative, in violation of Federal Rule of Evidence 403, (2) Ross has offered no justification for her failure to provide the disclosures as required, and (3) their admission would be severely prejudicial.

It is undisputed that Ross failed to disclose these witnesses, pursuant to Rule 26(a)(1)(A),[28] and failed to supplement her initial disclosures at an appropriate time, pursuant to Rule 26(e)(1). Therefore, pursuant to Rule 37(c)(1), the Court must examine whether this omission was "substantially justified" and whether it was "harmless." Ross, however, failed

---

[28] The exceptions to Rule 26(a)(1)(A) contained in Rule 26(a)(1)(E) are inapplicable to this case.

to offer any justification, substantial or otherwise, for her failure to identify these witnesses in a timely fashion. Regarding prejudice, Ross argues that Mercer would not suffer any prejudice, due to the fact that the same attorneys who represent Mercer in the present case acted as counsel in <u>Doe</u> and, during the depositions in question, they were able to cross examine these witnesses. Mercer refuses to concede the harmlessness of the omission, noting that it did not review the undisclosed duplicate materials before drafting its motion for summary judgment, due to their nondisclosure. As a result, Mercer contends it has not had the chance to refute the alleged facts set forth therein. The Court agrees with Mercer; Ross's omission was hardly harmless.

Additionally, Ross's Response contains one sentence that contends she also offers the deposition transcripts for the purpose of impeaching Mercer. The Eleventh Circuit has recognized that Rule 26(a)(3) exempts evidence used solely for impeachment because pretrial disclosure would significantly diminish its impeachment value. <u>Bearint ex rel. Bearint v. Dorrell Juvenile Group, Inc.</u>, 389 F.3d 1339, 1353 (11th Cir. 2004). This exception contains its own caveat, however—the Rule distinguishes between impeachment and substantive evidence, and exempts only evidence used solely for impeachment from the Rule 26 disclosure requirement. <u>See, e.g.</u>, <u>Cooley v. Great S. Wood Preserving</u>, 138 Fed. Appx. 149, 161 (11th Cir. 2005). Here, Ross failed to show the evidence was being offered *solely* for impeachment purposes. Her passing mention of an impeachment purpose, following two pages of argument regarding the evidence's substantive value, is insufficient.

Ross has offered no substantial justification for her failure to timely identify these

witnesses and depositions, nor is her failure to do so harmless. Furthermore, although Ross attempted to argue the evidence was to be used for impeachment purposes, she failed to show the evidence was being offered solely for that reason. Ross shall not be allowed to use these depositions in response to Mercer's Motion for Summary Judgment, and her Motion to Introduce Evidence from Witnesses Not Previously Identified in Plaintiff's Initial Disclosures (Doc. 45) is denied.[29] Accordingly, the Court will not consider these depositions in ruling on Mercer's Motion for Summary Judgment.

## 2. Five Witnesses Not in Motion

In addition to the six individuals Ross mentioned by name in her Motion to Introduce Evidence from Witnesses Not Previously Identified in Plaintiff's Initial Disclosures, she submitted depositions for five other people: Gary Collins (Doc. 53), Laurie Lankin (Doc. 55), James Russell Henry (Doc. 60), Stephen L. Gaines (Doc. 61), and William J. Causey (Doc. 64). Ross cited to these depositions throughout her Response to Mercer's Statement of Undisputed Material Facts (Doc. 41), specifically beginning in the section therein entitled "Plaintiff's Statement of Material Facts for Which Genuine Issues Exist for a Jury." (Id. at 5.) Given that Ross did not list these names when discussing witnesses whom she failed to include in her initial disclosures, and that Mercer did not object to their depositions on this ground, the Court must conclude Ross did identify these five witnesses

---

[29] The Court also notes that, although Ross attached the depositions for Anna Christine Coley (Doc. 54), Steven Brown (Doc. 56), Samuel F. Hart (Doc. 57), Raymond Golden (Doc. 58), and Christy Henry (Doc. 52), she never submitted a deposition for Barry Jenkins to the Court. Given the Court's denial of Ross's Motion, this omission is irrelevant.

in her initial disclosures. Therefore, the Court shall assume that these five depositions are properly before the Court while considering Mercer's Motion for Summary Judgment.

## V.      ANALYSIS: MOTION FOR SUMMARY JUDGMENT

### A.      Count 1: Title IX Violation for Student-On-Student Sexual Harassment

#### 1.      Standard

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.A. § 1681(a) (2000). The Supreme Court has recognized Title IX claims may be based on either teacher-on-student harassment or student-on-student harassment and that different legal standards apply in each circumstance. Compare Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998) (holding teacher-on-student harassment actionable), with Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 650 (1999) (finding an implied private right of action for a plaintiff to recover monetary damages against a school for student-on-student harassment). Analyzing a student-on-student sexual harassment claim, the Eleventh Circuit recently emphasized that to recover under Title IX, a plaintiff must prove four elements: (1) the defendant is a Title IX funding recipient; (2) an appropriate person[30] had actual knowledge

---

[30] "[A]n 'appropriate person' . . . is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).

of the discrimination or harassment the plaintiff alleges occurred; (3) the funding recipient[31] acted with deliberate indifference to known acts of harassment in its programs or activities; and (4) the harassment was so severe, pervasive, and objectively offensive that it effectively barred the victim's access to an educational opportunity or benefit.  See Williams v. Bd. of Regents of the Univ. Sys. of Ga., 477 F.3d 1282, 1293 (11th Cir. 2007) (citations and quotations omitted).

A brief analysis of the Williams case is illustrative of how the Eleventh Circuit recently addressed a Title IX complaint, albeit at the motion to dismiss stage.  In Williams, a former student at the University of Georgia ("UGA") brought a suit against UGA and the University of Georgia Athletic Association ("UGAA") for a violation of Title IX[32] after she was allegedly raped and sexually assaulted by three men, all varsity athletes at the University.   Id. at 1287.   In particular, the plaintiff alleged three forms of Title IX discrimination or harassment: (1) UGA and UGAA recruited and admitted the ringleader of the attack despite their knowledge of his past instances of sexual misconduct at other schools; (2) the attack itself; and (3) the discrimination she faced as a result of UGA's failure to

_____

[31] The Supreme Court has held that "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct."  Davis, 526 U.S. at 640.  Thus, in the student-on-student harassment context, it is the conduct of the funding recipient and not the alleged harasser that is analyzed, because the recipient "may not be liable for damages unless its deliberate indifference subjects its students to harassment."  Id. at 644-45 ("That is, the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it.") (quotations and citations omitted).

[32] Williams brought a number of other claims against UGA, UGAA and other defendants in her case, but here the Court focuses only on her Title IX claims against these two defendants.

respond to her allegations.  Id. at 1294.  This differentiation between the defendants' actions before the attack on Williams and their response afterwards underscores the Supreme Court's holding in Davis that courts can find deliberate indifference either when a defendant's actions make its students vulnerable to harassment or when a defendant's actions actually cause its students to undergo harassment.  Davis, 526 U.S. 645.  In other words, a court can find a Title IX violation when a university exhibits deliberate indifference before an attack that makes a student more vulnerable to the attack itself, or when a university exhibits deliberate indifference after an attack that causes a student to endure additional harassment.

### 2.    Application

#### a.    First Element: Funding Recipient

As to the first element, there has been no argument or evidence to suggest Mercer is not a Title IX funding recipient properly subject to Title IX liability.  The Court finds the first element of Ross's Title IX claim based on student-on-student sexual harassment is satisfied.

#### b.    Second Element: Actual Knowledge

As to the second element, the Court must initially identify what discrimination or harassment Ross alleges occurred before it can determine whether an appropriate person at Mercer had actual knowledge of it.[33]  In the present case, Ross's

_____

[33] The following section encompasses the Court's attempt to reorganize Ross's diffuse allegations into a more comprehensible form.  Paraphrasing a similarly frustrated judge grappling with a Title IX matter, this Court has done its best to make sense of a vexing case, where the facts are difficult, the law is complex and evolving, and the plaintiff's articulation of her claims is not a

Amended Complaint alleged three forms of harassment: (1) Mercer had actual knowledge of ΣAE's history of sexual assault allegations and failed to remedy the situation, making Ross more vulnerable to the attack she suffered (Am. Compl. ¶¶ 7-8); (2) Mercer had actual knowledge of Day's previous sexual harassment of Mercer students and failed to act, making Ross more vulnerable to the attack she suffered (Id. ¶¶ 19-21); and (3) Mercer had actual knowledge of Day's attack on Ross but failed to effectively respond to Ross's allegation, causing Ross to undergo harassment (Id. ¶¶ 13, 22-30, 32-45). Furthermore, reading Ross's Response to Mercer's Motion for Summary Judgment[34] reveals two additional allegations of harassment: (1) Mercer admitted Day despite having actual knowledge of his previous misconduct involving drugs and alcohol, making Ross more vulnerable to the attack she suffered (Doc. 40 at 4); and (2) Mercer exhibited laxity regarding student-on-student sexual

_____

model of clarity. See Wills v. Brown Univ., 184 F.3d 20, 31 (1st Cir. 1999) (Lipez, J., dissenting).

[34] A complaint is only one part of the entire record to be considered in a motion for summary judgment, and the technical wording of a complaint in isolation is generally not a sufficient basis for granting summary judgment. Other materials, such as depositions, interrogatories, and affidavits must also be considered. Furthermore, "a complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." Sams v. United Food & Commercial Workers Int'l Union, 866 F.2d 1380, 1384 (11th Cir. 1989). See generally Fed. R. Civ. P. 8(a). This liberal pleading standard is employed so that discovery may serve its proper function. "The simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002); but see Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1314 (11th Cir. 2004) (holding that a plaintiff may not amend his complaint through argument in a brief opposing summary judgment). Thus, the "evolution" of Ross's allegation of liability does not by itself render "new" claims lifeless, as the appropriate theory of liability may not become apparent until the parties have enjoyed sufficient time for discovery. The Court concludes Mercer had sufficient notice of all of Ross's claims and the grounds upon which they rest; thus, it will consider all of them.

harassment in general on its campus, making Ross more vulnerable to the attack she suffered. (<u>Id.</u> at 4-5).

Therefore, the Court must determine whether an "appropriate person" at Mercer had actual knowledge of these five forms of harassment that Ross allegedly faced: (1) Day's past struggles with drugs and alcohol; (2) past complaints of sexual assault against Day; (3) past allegations of sexual assault against ΣΑΕ; (4) Mercer's lax treatment of student-on-student harassment and failure to promulgate and disseminate sexual harassment policies; and 5) the alleged attack on January 8, 2003.

       i.       **Mercer's actual knowledge of Day's previous misconduct involving drugs and alcohol and admission to the university nonetheless**

Ross contends that an appropriate person at Mercer had actual knowledge of Day's previous problems with alcohol and drugs and his graduation from an internet correspondence course instead of a traditional high school, but decided to admit him to the university anyway due to his family's connections to the school. Ross has provided no evidence to support these allegations. However, even if the Court were to assume that Ross had somehow shown an appropriate official was aware of all of these facts, it is unclear how such knowledge could possibly give rise to Title IX liability. While the precise boundaries of what kind of "actual knowledge" a school must have to subject itself to Title IX liability remain undefined, it is generally accepted that the knowledge must encompass either actual notice of the precise instance of abuse that gave rise to the case at hand or actual knowledge of at least a significant risk of sexual abuse. <u>See, e.g.</u>, <u>Doe v. Sch. Admin. Dist.</u>

No. 19, 66 F. Supp. 2d 57, 63 (D. Me. 1999) (actual notice may be found "when the district . . . had notice that the teacher had abused other students in the past"); Massey v. Akron City Bd. of Educ., 82 F. Supp. 2d 735, 744 (N.D. Ohio 2000) ("For actual knowledge to exist, an agent of the school must be aware of facts that indicate a likelihood of discrimination.").

Here, even assuming Mercer knew Day had struggled with drugs and alcohol and graduated from an Internet correspondence course, such knowledge, at best, might have forewarned Mercer that Day ran the risk of battling substance abuse or encountering academic difficulties. Obviously, neither of these potential risks constitutes a Title IX violation. The Court is at a loss to see how this knowledge would have indicated to Mercer that Day might sexually assault a Mercer student.[35] Accordingly, the Court finds Ross has failed to put forth evidence sufficient for a jury to find she suffered discrimination due to Mercer's admission of Day.

   ii.   **Mercer's actual knowledge of Day's previous sexual harassment of Mercer students and failure to respond appropriately[36]**

---

[35] By contrast, in Williams, UGA's knowledge that an individual had been dismissed from two previous colleges after allegations that he had sexually assaulted two women and harassed another could have provided it with actual notice that the individual might pose a threat to sexually assault UGA students. See Williams, 477 F.3d at 1290, 1296. In that case, the Eleventh Circuit found that by admitting the alleged attacker to the University and then placing him in a student dorm without supervision or warnings, "UGA and UGAA substantially increased the risk faced by female students at UGA." Id. at 1296. The factual circumstances in the present case are far different. Mercer could not be said to have had any similar notice of potential danger to its students, even assuming it had actual knowledge of Day's alleged history of substance abuse and academic struggles.

[36] This allegation is one of two encompassed in Ross's first count labeled "Title IX Against Mercer University." Despite the fact that she failed to differentiate between them, Ross in fact

In her Complaint and her Amended Complaint, Ross alleges Mercer "had prior complaints regarding Day" and "had prior complaints that Day had sexually assaulted or raped other students." (Compl. ¶¶ 20, 21; Am. Compl. ¶¶ 20, 21.) However, Ross has provided no evidence to support this allegation,[37] and Mercer has provided testimony to support the opposite conclusion.[38] Thus, there is no evidence in the record to support Ross's conclusory allegation that Day has previously harassed Mercer students, much less a finding that any "appropriate person" at Mercer was aware of such harassment. Accordingly, the Court finds Ross has failed to put forth evidence sufficient for a jury to find she suffered discrimination due to any such claims.

### iii. Mercer's actual knowledge of ΣAE's history of sexual assault allegations and failure to remedy the situation[39]

---

alleged in this count that Mercer: 1) failed to address previous complaints against Day, thus making Ross vulnerable to later attack by him, and 2) failed to respond to Ross's complaint about Day's attack, and his continued presence so altered the terms and conditions of her education so as to constitute a Title IX violation. The former allegation is addressed in this Section; the latter allegation is addressed in Section V(A)(2)(b)(v).

[37] Given Ross's complete failure to address this allegation anywhere after mentioning it in her Complaints and her Amended Complaint, it is possible she abandoned this claim or that it evolved into her claim regarding Day's alleged history of drug and alcohol abuse discussed and dismissed in the last section.

[38] "Except for plaintiff's allegations, Mercer had not had any previous reports regarding sexual assault, rape, battery, date rape or date rape drugs regarding Daniel Day." (Danheiser Aff. ¶ 8.)

[39] The Court notes this claim regarding Mercer's inaction in the face of its alleged knowledge regarding ΣAE is not a specific count enumerated in Ross's Amended Complaint, but instead appears under the heading "Substantive Allegations." (Am. Compl. at 12.)

Ross contends that, prior to her alleged assault, Mercer had actual knowledge of at least two specific allegations that ΣAE members had committed sexual assaults, as well as general allegations that ΣAE members had access to date rape drugs. Ross relies on the depositions of four individuals to support these contentions: Ross, Day, Alexis Antonocci ("Antonocci") and Garrett Ratcliff ("Ratcliff"). However, Ross never filed any depositions for Antonocci or Ratcliff in the present case,[40] therefore she may not rely on them. As for the sections of Ross and Day's depositions that Ross alleges provide evidence of the aforementioned facts, the Court finds the testimony relied upon does nothing of the sort.

Ross's deposition reflects that (1) she had overheard at a party once that ΣAE members used date rape drugs (Ross Dep. 23-24); (2) she had spoken with another Mercer student, Kerry Kelly ("Kelly"), who felt she was twice drugged and raped by a member of ΣAE (id. at 41-46); and (3) another ΣAE member was accused of rape after Ross left Mercer (id. at 47-49). However, even if Ross overheard at a party that ΣAE used date rape drugs, this certainly does not establish that an appropriate official at Mercer was aware of such allegations. Regarding Kelly, Ross admits in her deposition that she is not sure whether these alleged incidents occurred before or after her encounter with Day (Ross Dep. 43), and states she is confident that Kelly never reported her allegations to the police or anyone within the

---

[40] Not only are there no depositions of Antonocci or Ratcliff filed in the record of the case, but there is also no Notice of Filing from Ross that mentions them, nor any request made by Ross that Mercer should file them. Their absence is unexplained and complete.

ΣAE Chapter (id. at 44-46).  Again, this evidence falls far short of proving Mercer had actual knowledge of this alleged attack.  Finally, whether or not an ΣAE member was accused of rape after Ross left Mercer has no bearing on whether Mercer had actual knowledge of a problem with the fraternity before Ross's alleged attack.

Day's deposition is even less helpful to Ross's case.  Day provides no evidence regarding any rumors about ΣAE members using date rape drugs.  Regarding the two ΣAE members whom Ross had discussed, Day admitted he heard rumors that both men had been accused of sexual assault.  (Day Dep. 54-55).  However, Day never gave any testimony that would support the conclusion that Mercer had any actual knowledge of these alleged incidents.

Finally, the Court notes that Ross attached exhibits to her Response to Mercer's Motion for Summary Judgment that include excerpts from a study conducted by the Association of American Colleges that purportedly found the group most likely to commit gang rape on the college campus was the fraternity.  (Doc. 40 at 24.)  This information is irrelevant to the question of whether Mercer had actual knowledge of this specific chapter of ΣAE's alleged history of sexual assault allegations at Mercer.  Aside from these exhibits, Ross has failed to introduce any evidence to bolster her conclusory allegations.  Generalized findings in national studies will not relieve her burden.

Ross has provided insufficient evidence to show that Mercer had any actual knowledge of past complaints against ΣAE.  Accordingly, the Court finds Ross has failed to put forth evidence sufficient for a jury to find she suffered discrimination due to a claim

that Mercer had actual knowledge of ΣAE's history of sexual assault allegations and failed to remedy the situation.

### iv. Mercer's actual knowledge of student-on-student sexual harassment in general on its campus

Ross asserts that "Mercer is clearly lax on student-on-student harassment." (Doc. 40 at 4.) Ross's allegation of "laxity" is twofold: first, that "Mercer has never brought disciplinary charges against a student for alleged sexual assault," and second, that Mercer's sexual harassment policy was inadequately drafted and disseminated. (Id. at 4-5, 6-9.) The Court will address each claim in turn.

Ross repeatedly asserts that "Mercer has received complaint after complaint of sexual assault and harassment" and concludes that "[u]tter failure to act in light of complaint after complaint of sexual harassment is deliberate indifference." (Id. at 10.) Ross lists a host of alleged complaints and assaults of which she asserts Mercer had actual knowledge. These incidents fall into two categories—those of which the Court finds no appropriate official at Mercer had actual knowledge, and those of which the Court finds an appropriate official did have actual knowledge.

The Court rejects nine of the alleged incidents of assault or harassment upon which Ross attempts to base her claim. First, the Court rejects her allegations concerning sexual assaults committed by ΣAE members other than Day for the reasons set forth earlier in Section V(A)(2)(b)(iii). Second, the Court rejects her allegations regarding the assaults litigated in the cases <u>Zenobia Lacabe v. The Corporation of Mercer University</u> and <u>Doe v.</u>

Mercer University, which allegedly dealt with sexual harassment complaints of which Mercer was aware. As for Lacabe, Ross failed to submit the court records from the case for the Court's consideration,[41] and the Court ruled Lacabe's interrogatories inadmissible for the reasons set forth in Section IV(B)(2). Therefore, Ross has failed to provide evidence of what information, exactly, an appropriate official at Mercer might have had about the alleged attack in the Lacabe case.[42] Likewise, Ross did not submit the court records from Doe for the Court's consideration either; therefore, Ross has failed to provide evidence of what information an appropriate official at Mercer might have had about the incident in that case. Third, Ross states "KK1 was allegedly raped by a Resident Assistant. No judicial action was taken against him. He resigned as an RA." (Doc. 41 at 9, ¶ 22.) Ross cites to the deposition of Henry, the former Residence Life Coordinator, for this information. For the reasons set forth in Section IV(C)(1), Henry's deposition is not properly before the Court. Therefore, Ross has not proven that an appropriate person at Mercer had actual knowledge of this incident. Fourth, Ross alleges that Jenkins, the Mercer Dean of Student Affairs, received

---

[41] While the Court might have taken judicial notice of its own records, neither of these cases appear to have been filed in the Middle District of Georgia, or even in federal court at all. Instead, both cases were apparently filed in Superior Court of Fulton County. It was Ross's obligation, not the Court's, to provide these court records, had she wished to use them as evidence in support of her case.

[42] There is a discussion later in this section about an attack allegedly suffered by a Mercer student with the initials "ZL." While it is certainly possible that Zenobia Lacabe was this same "ZL," Ross failed to connect the two individuals or explain that they were the same woman. Irrespective of this possibility, given the Court's finding that Mercer exhibited no deliberate indifference to ZL's alleged attack, it would be irrelevant if she and Zenobia Lacabe were the same person.

"four or five" reports of sexual assault.  (Doc. 41 at 10, ¶ 24.)  The Court cannot rely on this assertion, though, since Ross failed to submit a deposition for Jenkins.  Fifth, Ross alleges "[i]n 2000, BP, a student, was abducted from Mercer's campus, taken off campus and sexually assaulted."  (Doc. 41 at10, ¶ 25.)  To support this assertion, Ross cites to Brown and Coley's depositions.  For the reasons set forth in Section IV(C)(1), these depositions are not properly before the Court.  Therefore, Ross has not proven that an appropriate person at Mercer had actual knowledge of this incident.  Sixth, Ross asserts HW complained to Mercer officials that she was given a date rape drug and raped.  (Doc. 41 at 10, ¶ 26.)  Ross cited to her own deposition, as well as Day's, to prove this allegation.  While Ross does testify in her deposition that she is certain HW complained to Mercer officials, Ross never said who these officials were.  In fact it was the attorney questioning Ross who asked "So you know for a fact . . . that H[.W.] complained to Mercer officials?"  (Ross Dep. 211.)  Ross merely answered "Yes."  This vague affirmation is insufficient evidence that an "appropriate" official at Mercer had actual knowledge of the alleged attack.  Day's deposition is even less helpful—all he volunteers is that he heard HW "cried rape," without any description of with whom HW might have filed a complaint.  Seventh, Ross asserts "NR made an allegation of sexual assault against a fraternity member."  (Doc. 41 at 10, ¶ 28.)  Ross cites to her own deposition to prove this, but, again, an examination of the deposition reveals while NR apparently told her "she had had a similar experience" (Ross Dep. 52), there is no evidence about what actually happened to NR or, more importantly, that she told an appropriate official at Mercer about it.  The eight and ninth incidents constitute two of the three exhibits

attached to Collins's deposition. Ross explains these exhibits by stating "[b]etween 1998 and 1999, Mercer Police had three rapes reported to it by a women [sic] that occurred on Mercer's Campus." (Doc. 41 at 9, ¶ 21.) A closer examination of those exhibits and Collins's deposition reveals that the second incident occurred on November 5, 1998, and its victim was not a Mercer student. There is evidence that the Mercer Police were aware of this attack, even though the official report was made to the Macon Police. (Collins Dep. 73-75, 78-79, Ex. 25.) Although the Mercer Police apparently knew about this incident, there is no evidence an appropriate official at Mercer had actual knowledge about it.[43] The final incident occurred on September 17, 1999, and the evidence indicates that the victim, a Mercer student, only reported the attack to a member of the Mercer Police. (Id. 75-76, Ex. 26.) Therefore, Ross has failed to produce evidence that an appropriate official at Mercer had actual knowledge of this attack sufficient to trigger liability under Title IX.

Notwithstanding the fact that many of the incidents Ross relied upon to prove

---

[43] The Court recognizes that generally an "appropriate individual" for purposes of Title IX liability is a "supervisor" or a "school official high enough up the chain-of-command that his acts constitute an official decision." Floyd v. Waiters, 171 F.3d 1264, 1264 (11th Cir. 1999). Thus, in a typical Title IX case, an appropriate individual might be a University President, a high school superintendent, or the chairman of an appropriate board of education and not a teacher, coach or employee. A campus police officer does not fit neatly into this traditional paradigm. One might argue that, as an individual both charged and empowered to remedy misconduct, a police officer, whether an officer on patrol or a police chief, could be categorized as a University official with authority to take corrective action to end an instance of discrimination. However, adopting this overly literal interpretation would overlook that an "appropriate official" is actually an individual with the authority to fix "certain *types*" of discrimination. While a campus police officer is certainly empowered to halt a sexual assault that occurred immediately in front of him, he does not have the power or responsibility to reformulate University sexual harassment policy. Therefore, the Court concludes that if the only person who had knowledge of this attack was a Mercer police officer, that is insufficient to give the University actual notice of the alleged attack.

Mercer's actual knowledge of prior instances of sexual harassment on campus failed to do so, Ross did provide evidence that an appropriate official at Mercer had actual knowledge of six past incidents of sexual assault that predated her own alleged attack. First, there is Ross's assertion that "[i]n 1996, Mercer University basketball players and a student being recruited for the basketball team on the Mercer campus allegedly raped ZL." (Doc. 41 at 9, ¶ 20.) As proof for this assertion, Ross cites to the depositions of Jenkins and Collins. Jenkins' deposition was never submitted to the Court; hence, this source is unavailing. Collins' deposition is before the Court, though, and in the pages referenced by Ross, he does talk about a student-on-student sexual assault that occurred at Mercer. (Collins Dep. 4-5.) Collins never mentions the date the event occurred, nor the name or initials of the victim, nor any details about the attack.[44] (Id. 4-6.) Nonetheless, Collins does mention the alleged attacker went before the Judicial Board at Mercer, so the Court will assume that an appropriate official at Mercer knew about this attack. Second, there is the exhibit attached to Collins's deposition which indicates on November 23, 1998, a Mercer student reported a rape to the Macon Police, as well as to Mercer's general counsel's office and human resources. (Id. 72-73, Ex. 24.) The Court is satisfied an appropriate official at Mercer had

---

[44] The case can certainly be made that Collins's extremely vague recollection is insufficient to prove specifically that in 1996 a student with the initials ZL was raped by Mercer basketball players. However, Mercer did not challenge Ross's contention that this was, in fact, the case. Setting this concern aside, the Court notes that this actual knowledge issue is inconsequential in light of the Court's later finding in Section (V)(A)(2)(c)(i) that there is no evidence Mercer acted with deliberate indifference to this claim. Any potential mistake with regards to actual knowledge is irrelevant.

actual knowledge of this attack.[45]  Third, there is the case of JT, whose alleged rape was reported to the Mercer Police in 2000.  The Mercer Police investigated this allegation and reported their findings to the Dean of Students.  (Doc. 41 at 9, ¶ 23.)  It is clear from Collins and Causey's depositions that a number of appropriate officials at Mercer had sufficient knowledge of this alleged assault.  (Collins Dep. 53-60, Causey Dep. 31-34.)  The fourth, fifth and sixth attacks came from statistics for "Criminal Offenses - On-Campus" included in the "2000-2001 Lair, Student Handbook & Academic Planner" ("the Lair") (Doc. 40-6, Ex. A at 17), which reveal that three "forcible sex offenses" occurred on Mercer's campus between 1999-2001.  As this publication was produced by Mercer and disseminated as an official University public record, the Court concludes Ross has shown appropriate officials at Mercer knew about these three incidents.

Ross also attacks the propriety, efficacy and distribution of Mercer's sexual harassment policy.  In particular, Ross alleges Mercer had actual knowledge that its relevant school policies failed to (1) disclose that sexual assault is prohibited, (2) specify to whom a student should report allegations of sexual assault, (3) designate a reasonable period of time within which to complete the major stages of the complaint process, and (4) encourage students to report sexual assaults.  (Doc. 40 at 7-8.)  Ross also alleges Mercer knew it had

---

[45] Here, one could argue that notification of "Mercer's general counsel's office and human resources" might be insufficient to prove that an appropriate official at Mercer had been notified of this alleged attack.  Setting this concern aside, the Court notes that this actual knowledge issue is inconsequential in light of the Court's later finding in Section (V)(A)(2)(c)(i) that there is no evidence Mercer acted with deliberate indifference to this claim.  Any potential mistake with regards to actual knowledge is irrelevant.

not adequately disseminated its policies.  (Id. at 8.)

As an initial matter, the Court agrees with Ross that Title IX regulations require funding recipients to designate an employee to coordinate its Title IX enforcement efforts, notify its students and employees of that individual's name and contact information, and "adopt and publish grievance procedures for providing for prompt and equitable resolution of student and employee complaints."  34 C.F.R. § 106.8 (2007).  However, the Supreme Court has held that a funding recipient's failure to comply with the regulation "does not establish the requisite actual notice and deliberate indifference for a private right of action . . . . [and] failure to promulgate a grievance procedure does not itself constitute 'discrimination' under Title IX."  Gebser, 524 U.S. at 292.  In other words, although the Department of Education could enforce these requirements administratively, the Supreme Court has "never held . . . that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements."  Id. Accordingly, because Ross cannot directly sue Mercer for violating regulations such as 34 C.F.R. § 106.8, 62 Fed.Reg. 12044 or 62 Fed.Reg. 12045, any such violations cannot support a claim for deliberate indifference.[46]  See, e.g., Peck v. West Aurora Sch. Dist. 129, No. 06

---

[46] In Williams, the Eleventh Circuit found UGA's failure to implement a more protective sexual harassment policy to deal with future incidents "inexplicable and discriminatory."  Williams, 477 F.3d at 1297.  Despite this admonishment, the Eleventh Circuit added that its "holding does not affect the Supreme Court's precedent that the failure to promulgate a grievance procedure does not itself constitute discrimination under Title IX."  Id. at 1297 n.8 (citation and quotation omitted).  Out of an abundance of caution for whether a Title IX defendant's failure to institute a policy similar to the one in the Department of Education Regulations is relevant when determining whether the defendant acted with deliberate indifference, the Court has considered Mercer's point-by-point refutation of Ross's allegations that the University's sexual harassment policy was inadequate.  In

C 1153, 2006 WL 2579678, at *6 (N.D. Ill. Aug. 30, 2006); <u>Palmer ex rel. Palmer v. Santa Rosa County, Fla., Sch. Board</u>, No. 3:05cv218/MCR, 2005 WL 3338724, at *5 (N.D. Fla. Dec. 8, 2005).

### v. Mercer's actual knowledge of the alleged attack on January 8, 2003

Ross has established that an "appropriate person" at Mercer had actual knowledge of Day's alleged harassment of Ross. Danheiser, the Interim Dean of Student Affairs, Flader, the Director of Residential and Judicial Affairs, and Fleming, the Executive Vice-President and Provost, were all notified about Day's alleged attack within a day or two of its alleged occurrence. (Danheiser Aff. ¶¶ 3-5.) Mercer does not dispute that these three high-ranking officials had authority to take corrective measures.

### c. Third Element: Deliberate Indifference

Regarding the third element, the Supreme Court held that funding recipients are deliberately indifferent "only where the recipient's response to the harassment

---

particular, Mercer analyzed its own policy and highlighted that (1) the policy thoroughly defines and prohibits sexual harassment; (2) the policy listed several individuals to whom students may report allegations of sexual harassment; (3) the policy sets forth the stages of the grievance process; (4) the policy encourages students to report sexual harassment; and (5) the policy is provided to all students. (Doc. 47 at 6-7.) The Court agrees with Ross that Mercer's policy does not perfectly mirror the policy the Department of Education calls for when, for example, it states an official's title and the phone number where he can be contacted for complaints, but not it does not include that official's name and address. Nonetheless, the Court is comfortable that the policy embodies the spirit—if not letter—of the federal regulations. Therefore, to the extent the Court should consider Mercer's policy, despite the Supreme Court's admonition in <u>Gebser</u>, the Court concludes Mercer has instituted a policy sufficiently similar to the one in the Department of Education Regulations and informed its students about that policy. Accordingly, the Court finds that Ross has provided insufficient evidence by which a jury could find Mercer acted with deliberate indifference with respect to this claim.

or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. This standard acknowledges the maxim that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." Id. Therefore, the determination of whether a funding recipient's response to the alleged harassment was "clearly unreasonable" as a matter of law is one that can be made by a district court on a motion for summary judgment. Id. at 649.

### i. Mercer's response to past allegations of student-on-student sexual harassment in general on its campus

As discussed above, Ross provided evidence that an appropriate official at Mercer was aware of six past incidents of sexual assault that predated her own alleged attack: (1) ZL's alleged 1996 rape, (2) the November 23, 1998 rape reported to the Macon Police, as well as Mercer's general counsel's office and human resources, (3) JT's 2000 rape, and (4-6) the three "forcible sex offenses" that occurred on Mercer's campus between 1999-2001 as reported in the Lair. The Court must now examine each alleged attack to determine whether Ross has proven that Mercer's response to that attack exhibited deliberate indifference.

The only proof before the Court regarding the ZL attack submitted by Ross is Collins's deposition. As mentioned above, Collins never mentions the date the event occurred, nor the name or initials of the victim, nor any details about the attack. (Collins Dep. 4-6.) Collins's description of Mercer's response to the attack is similarly vague. Although he does mention the alleged attacker went before the Judicial Board at Mercer, he

is unsure what the outcome was, offering "I can't really recall the details, but I want to say he was suspended from school and everything." (<u>Id.</u> 6.) Based on this bare summary, the Court cannot conclude that Mercer's response was clearly unreasonable as a matter of law—indeed, to the best of the Court's knowledge, and based on the submission of the Plaintiff, Mercer brought the offender before its judicial system and suspended him. The Court concludes there is no evidence that Mercer's response to this alleged past sexual harassment made Ross more vulnerable to her alleged attack.

Ross submitted no evidence regarding Mercer's response to the November 23, 1998 rape reported to the Macon Police. The Court is forced to assume that because Ross asserts Mercer was utterly unresponsive to its students' sexual harassment complaints in the years preceding her assault, that Ross alleges Mercer did nothing in response to this allegation. However, conclusory allegations will not assist Ross, and in the light of Ross's utter failure to present any evidence on this issue,[47] the Court cannot conclude that Mercer's response was clearly unreasonable as a matter of law. The Court finds there is no evidence that Mercer's response to this alleged past incident of sexual harassment made Ross more vulnerable to her alleged attack.

Ross submitted more evidence about JT's alleged attack, and Mercer's response to it, than any of the other alleged incidents that occurred before her own. In that case, JT, a

---

[47] The Court acknowledges the difficulty in presenting evidence of a negative. However, at a minimum, Ross could have taken the depositions of the relevant Mercer employees and could have inquired as to what, if any, actions were taken.

Mercer student at the time, was allegedly raped by MK, a former Mercer student, who was visiting a mutual friend of both JT and MK in Macon. The rape was reported to the Mercer Police, and Causey, under Collins's supervision, conducted a thorough investigation of the allegations. When Causey completed his investigation, he turned the results over to an Assistant District Attorney (ADA) in Macon as well as to Collins. According to Collins's deposition, the ADA decided not to charge or prosecute MK, and Mercer took no judicial action against him either. While Ross apparently implies that Mercer's lack of action indicates deliberate indifference, the Court disagrees. As Collins pointed out, MK was not a student of Mercer at the time of the attack, nor afterwards, severely limiting any direct action Mercer could have taken against him. Nor does the Court believe Mercer was under any obligation to mark MK's school record against the possibility of his returning to Mercer at some point in the future, since he was never charged with, much less found guilty of, a crime. The Court is satisfied Mercer did not exhibit deliberate indifference to the alleged harassment and that there is no evidence that Mercer's response to this alleged past sexual harassment made Ross more vulnerable to her alleged attack.

Finally, with respect to the three "forcible sex offenses" that occurred on Mercer's campus between 1999-2001 listed in the Lair, the Court cannot find Mercer acted with deliberate indifference towards these three incidents. Ross has submitted no evidence whatsoever indicating how Mercer may have reacted to these incidents, and conclusory allegations that Mercer's response was inadequate are insufficient. The Court finds there is no evidence that Mercer's response to these past sexual harassments made Ross more

vulnerable to her alleged attack.

Although Ross has shown an appropriate official at Mercer had actual knowledge of the six[48] aforementioned incidents, she has not proven that Mercer acted with deliberate indifference towards any of them. The mere fact that students at Mercer have been victims of sexual assault in the past is, unfortunately, not uncommon for a University setting. Past incidents of assault alone—without any evidence of deliberate indifference on Mercer's part—are not enough to trigger Title IX liability for Mercer.

### ii. Mercer's response to Ross's alleged attack

As already mentioned, it is undeniable that Mercer engaged in some response to Ross's allegations—the key inquiry for the Court is whether that response was clearly inadequate. Mercer's investigation began immediately upon hearing about the alleged assault, when Danheiser contacted the Collins to begin an investigation. (Danheiser Aff. ¶ 6.) Collins conducted his own investigation, which included one of his officer's interviewing Day.[49] Danheiser also investigated the matter personally, meeting with Dan

---

[48] It almost goes without saying that there may be some overlap between these three incidents mentioned in the Lair and some of the other incidents discussed by the Court. Therefore, there might be less than six incidents in question. Of course, no evidence was ever submitted to the Court addressing this possibility.

[49] Again, for the reasons set forth earlier in Sections IV(A)(1)(a) and IV(A)(1)(b), the Court will not consider whether Collins interviewed individuals Day listed as potential witnesses to the events (Danheiser Aff. ¶ 11), went to local bars to question the owners and staff about the night in question (id. ¶ 14), or monitored the Macon Police Department's criminal investigation of the matter, receiving and reviewing copies of all of the interviews, statements, incident reports and Ross's medical test results, until he was informed by the Macon Police Department that it had insufficient evidence to prosecute Day and was closing its investigation (id. ¶ 12).

Ross and Ross.  (Id. ¶¶ 9, 15.)  At least two Mercer officials besides Danheiser also met with Dan Ross: Fleming and Dunn.  (Danheiser Aff. ¶ 9; Dan Ross Aff. ¶ 7.)  Mercer's President did not meet with Dan Ross, despite the latter's request.  (Dan Ross Aff. ¶ 8.)  After Ross filed a complaint, she spoke at least twice with Flader.  (Ross Dep. 129-30, 199-200.)[50] Within two weeks of her request, Ross was moved to new housing.  (Danheiser Aff. ¶ 17.) Ross was also referred to a Mercer counselor, with whom she met a number of times (Danheiser Aff.  ¶ 18; Ross Dep. 169-70, 180).

Despite taking these steps, Mercer's response to Ross's allegations could be found inadequate.  Although the Macon Police apparently conducted some sort of investigation, the Court has before it only the bare minimum of evidence showing that Mercer's own police force monitored that investigation or conducted a parallel one of its own.  Likewise, the Court has barely enough evidence before it to conclude that there was some informal inquiry by Danheiser and other Mercer officials, but it is not even clear whether those officials ever spoke directly with Day.  While Mercer officials did meet with Ross and her father, Mercer failed to respond to Ross's clear request that an investigation take place.  Obviously, Mercer never initiated formal judicial proceedings against Day, nor did Mercer take any other action against Day. While Mercer blames this lack of internal judicial processes on Ross's alleged failure to complete additional paperwork, a jury could find this rationale was inadequate to explain Mercer's inaction.  Finally, while Mercer did eventually move Ross to another dorm,

---

[50] Similarly, for the reasons set forth in Sections IV(A)(1)(c), IV(A)(1)(d) and IV(A)(1)(e), the Court may not consider Danheiser's hearsay regarding Flader and Knott.

a jury could certainly find that the two week delay before this change occurred was unwarranted.

In summary, while it is clear that Mercer made some attempts to address Ross's allegations, based on the evidence before it, the Court cannot be certain that the University's limited response was not clearly unreasonable. Title IX does not allow a victim to dictate the remedial action a school must take with regard to sexual harassment, but it does protect her from deliberate indifference. Given the bare nature of the record before the Court regarding Mercer's investigation, the factual disputes between the parties regarding the interaction between Ross and Flader, and the apparent lack of any corrective action on behalf of Mercer, the Court is forced to conclude a jury could find Mercer acted with deliberate indifference in its response to Ross's alleged attack.

### d. Fourth Element: Severity and Barred Educational Opportunities

The fourth element of a Title IX claim has two main components: (1) whether the discrimination was severe, pervasive and objectively offensive and (2) whether it effectively barred the plaintiff's access to an educational opportunity or benefit. The Supreme Court has instructed that "[w]hether gender-oriented conduct rises to the level of actionable harassment . . . depends on a constellation of surrounding circumstances, expectations and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." Davis, 526 U.S. at 651 (citation and quotations omitted). Notwithstanding the foregoing principles, both the Supreme Court and

the Eleventh Circuit have also cautioned that a single instance of one-on-one peer harassment is likely not actionable under Title IX.

> Moreover, the provision that the discrimination occur "under any education program or activity" suggests that the behavior be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity. Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment. By limiting private damages actions to cases having a systemic effect on educational programs or activities, we reconcile the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to student behavior, realities that Congress could not have meant to be ignored.

Id. at 652-53; see also Williams, 477 F.3d at 1297-98.

In light of the strong indications from both the Supreme Court and the Eleventh Circuit that a single incident of sexual harassment is not actionable under Title IX, the Court must conclude that Ross has failed to show that the discrimination she allegedly suffered was so severe, pervasive and objectively offensive as to have the "systematic effect" of denying her equal access to an educational program or activity. Before making this ruling, the Court reviewed various cases that reached the opposite conclusion. See, e.g., Doe ex rel. Doe v. Dallas Indep. Sch. Dist., No. Civ.A.3:01-cv-1092-R, 2002 WL 1592694, at *6-7 (N.D. Tex. July 16, 2002) (holding a single instance of a forced manual penetration of a student's vagina by another student's finger qualifies as sufficiently severe one-on-one peer harassment). Additionally, the Court does not mean to imply that rape is not a horrific crime, or that a

single instance cannot constitute severe and objectively offensive discrimination. However, the Court must conclude that a single incident, however traumatic to its victim, is not likely to be pervasive, or to have a systemic effect on educational activities.

Once again, the Court finds it helpful to compare the facts in this case to those in Williams. Despite Ross's conscious attempt to analogize her allegations to Williams's, the facts of and situations in the two cases are nevertheless markedly distinguishable. Ross alleged a single attack by one individual;[51] Williams alleged two separate acts of sexual assault by three people engaged in a conspiracy that could be characterized as a "continuous series of events." Ross has not put forth evidence showing Mercer had knowledge of prior sexual misconduct by Day; UGA may have had clear knowledge of extensive prior sexual misconduct by the ringleader of Williams's assault. There is no evidence that Mercer ignored a sexual harassment problem, either in the subpopulation of $\Sigma AE$ or at the university at large; UGA and UGAA allegedly failed to inform student-athletes about the applicable sexual harassment policy, even after suggestions from those same student-athletes that they do so. At most, it could be said that Ross's alleged attack meets the requirements of severity and objective offensiveness, but, based on Supreme Court and Eleventh Circuit guidance, the Court will hold this single incident of peer-on-peer sexual harassment qualifies as pervasive

---

[51] Indeed, Ross cannot even remember the assault itself or any of its characteristics. While it is unfortunate that her memory loss, which Day allegedly caused, would be used against her, the Court is constrained to work within her allegations, which are scant. By contrast, Williams could at least plead to the court exactly what she alleges occurred—Ross can only guess that something happened without being able to provide any details that might strengthen her case on this Title IX prong.

discrimination. Therefore, based on the foregoing analysis, the Court concludes Ross has failed to provide enough evidence for a jury to conclude her discrimination was severe, pervasive and objectively offensive.[52] Mercer is entitled to summary judgment on this claim.

## B.     Count 2: Deliberate Indifference

Ross's Amended Complaint sets forth two Title IX counts. (Am. Compl. 4, 7.) Her first count was styled "Title IX Against Mercer." Her second count was entitled "Title IX Against Mercer University for Deliberate Indifference." The allegations of the second count encompassed the same claims of harassment embodied in Count One, albeit in a somewhat more expanded form. Ross's differentiation between the two counts, as one being merely "Title IX" and one as "Title IX . . . for Deliberate Indifference" is nonsensical. By its nature, a successful Title IX claim necessarily encompasses an element of deliberate indifference; thus, "Deliberate Indifference Under Title IX" is not a separate claim. Accordingly, for the reasons set forth above, Mercer is entitled to summary judgment on this claim.

## C.     Count 3: Retaliation

### 1.     Standard

In 2005, after this case was filed, the Supreme Court explicitly recognized that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of

---

[52] Because the Court concludes the discrimination was not "severe, pervasive, and objectively offensive," it need not resolve whether it "effectively bar[red] the victim's access to an educational opportunity or benefit." Davis, 526 U.S. at 633.

action." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 172-73 (2005) ("when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX"). When it announced the holding in Jackson, the Supreme Court failed to provide any guidance on how to evaluate Title IX retaliation claims. To date, the Eleventh Circuit does not appear to have expressly set forth the elements for a retaliation claim under Title IX either. Nevertheless, most courts that have addressed the issue have imported the standards for a retaliation claim under Title VII to establish the elements necessary to constitute a retaliation claim under Title IX. See, e.g., Murray v. N.Y. Univ. Coll. of Dentistry, 57 F.3d 243, 248 (2d Cir. 1995) (collecting cases).

Typically, a Title IX retaliation claim, like a Title VII retaliation claim, involves an adverse employment action by an employer-defendant against an employee-plaintiff. Such was the case in Jackson, in which the Supreme Court allowed a high school girls' basketball coach to claim that his employer retaliated against him for protesting discrimination against the girls' team. See Jackson, 544 U.S. at 180 (concluding Title IX's enforcement scheme would unravel if whistleblowers lacked protection against retaliation). However, Title IX retaliation claims have also arisen outside of the employer/employee context.

In the words of the United States Court of Appeals for the First Circuit:

Modifying the retaliation paradigm to fit the educational context,[53] a plaintiff

_____

[53] In the traditional Title VII retaliation paradigm, to establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in conduct protected by Title VII; (2) she

may establish a prima facie case for a Title IX retaliation claim by alleging facts sufficient to show that she engaged in activity protected by Title IX, that the alleged retaliator knew of the protected activity, that the alleged retaliator subsequently undertook some action disadvantageous to the actor, and that a retaliatory motive played a substantial part in prompting the adverse action.

Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 67 (1st Cir. 2002).

If a plaintiff can meet this prima facie burden, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If the defendant satisfies that burden, the plaintiff then must demonstrate that the stated reason was not the defendant's true reason, but a mere pretext for discrimination. Id. Put simply, "[t]o prevail on the merits, [the plaintiff] will have to prove that [the defendant] retaliated against him because he complained of sex discrimination." Jackson, 544 U.S. at 183.

### 2. Application

Ross alleges (1) she complained about sexual harassment to "Defendant" (Am. Compl. ¶ 46); (2) Ross's complaint constituted protected conduct under Title IX (id. ¶ 47); (3) "Defendant's" decision not to remedy the harassment amounted to retaliation (id. ¶ 48); (4) "Defendant's" treatment of Ross following her complaint, including intimidation and threats, constituted retaliation (id. ¶ 49); and (5) "Defendant's" treatment of Ross was due to her complaint of sexual harassment (id. ¶ 50). Mercer does not dispute that Ross's complaint about Day's alleged attack constitutes conduct protected by Title IX, so the first

---

suffered an adverse action; and (3) there was a causal connection between the protected conduct and the adverse action. See Stavropoulos v. Firestone, 361 F.3d 610, 616 (11th Cir. 2004).

element of her prima facie case is satisfied. The second element is also satisfied, as it is clear that Ross lodged her complaint with a number of high-ranking officials at Mercer, and therefore the "alleged retaliator" knew about Ross's protected activity. Therefore, the Court must examine the two incidents of retaliation mentioned in Ross's Complaint: (1) Ross's treatment following the harassment, including intimidation and threats, and (2) Mercer's decision not to remedy the harassment Ross endured.

### a.    Kathy's Abuse

Mercer disputes that Ross has proven any retaliation on Mercer's part as a result of her complaint. (Mot. Summ. J. at 13-14, Doc. 47 at 9-10.) Ross responds that "[a] reasonable juror could conclude that having things thrown at your window, being shouted at, told you are hated and having multiple messages left on your voicemail is threatening or intimidating behavior." (Doc. 40 at 14.) Although the title of this claim makes it clear that Mercer is the "Defendant" referred to in Ross's allegation, it is equally clear from Ross's deposition and briefs that the intimidation and threats she allegedly suffered came at the hands of Kathy, a member of $\Sigma AE$. (Ross Dep. 156, 158-59.) Neither Kathy nor $\Sigma AE$ are defendants in the present suit, although $\Sigma AE$ was a defendant at one time, and Ross has not alleged or presented evidence that Mercer engaged in any intimidation or threats.[54] Therefore, any evidence of Kathy's alleged actions are insufficient to establish that Mercer undertook some action disadvantageous to Ross. Mercer is entitled to summary

---

[54] Additionally, there have been no allegations, nor is there any proof, that Kathy was acting as Mercer's agent or at Mercer's behest when he committed the alleged acts.

judgment on this element of Ross' retaliation claim.

### b. Mercer's Decision Not to Remedy Harassment

Ross also complains that Mercer's decision not to remedy the harassment she had endured constituted retaliation. Her contention fails for two reasons. First, while the Court recognizes various courts have held that deliberately harmful inaction may equal a "disadvantageous action" for the purposes of retaliation,[55] the Court does not believe the Supreme Court, when it announced its holding in Jackson, intended the same set of facts to give rise to both a discrimination and a retaliation claim. Once Ross's claim for deliberate indifference under Title IX failed due to her inability to satisfy the fourth prong of that test, the matter concluded. She does not get a second bite at the apple through a retaliation claim based on the same events, even in light of the Supreme Court's repeated admonishments that Title IX is a statute that should be read broadly. Second, even if the Court accepted that Mercer's deliberate indifference constituted a disadvantageous action to Ross, and that she could bring both a discrimination and a retaliation claim based on the same set of facts, Ross has failed to present evidence sufficient to create a jury question on the

---

[55] Numerous courts have held that Title VII protects employees from employers who condone and encourage discrimination by failing to investigate or remedy it. See, e.g., Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (finding the FBI's refusal to investigate a death threat constitutes an adverse retaliatory action, because "a reasonable FBI agent well might be dissuaded from engaging in activity protected by Title VII if he knew that doing so would leave him unprotected by the FBI"); Galdamez v. Potter, 415 F.3d 1015, 1022 (9th Cir. 2005) ("An employer may be held liable for the actionable third-party harassment of its employees where it ratifies or condones the conduct by failing to investigate and remedy it after learning of it."); Knox v. Indiana, 93 F.3d 1327, 1334-35 (recognizing that a jury must be allowed to "evaluate the record as a whole and to decide whether the State . . . retaliated against Knox . . . by sitting on its hands in the face of the campaign of co-worker harassment about which it knew.").

issue of whether that a retaliatory motive played a substantial part in prompting the adverse action. She has offered no evidence of any kind that would show that Mercer's inaction was motivated by retaliation. Accordingly, Ross has failed to satisfy her prima facie case of retaliation, and Mercer is entitled to summary judgment on this claim.

### D. Count 4: Disparate Impact

Count Four of Ross's Amended Complaint is entitled "Title IX Against Mercer University for Disparate Impact/Treatment." (Am. Compl. 10.) Initially, given the vague title and confusing allegations from Ross, it was unclear whether Ross was alleging Mercer had a facially neutral policy with a disparate impact on women at Mercer, or whether Ross alleged Mercer's treatment of allegations of sexual abuse and harassment amounted to intentional discrimination. Ross was, in fact, ordered by the Court to clarify whether her claim was one of disparate impact or disparate intent. (October 31, 2005 Order at 7.) By way of her Response to Mercer's Motion for Summary Judgment, it is now clear that Ross's claim is one of disparate impact (Doc. 40 at 14-15), and it will be addressed as such.

### 1. Standard

Both Mercer and Ross agree that the elements required to state a claim under Title IX for disparate impact mirror those required under Title VII. (Mot. Summ. J. at 14; Doc. 40 at 14.) At the very least, to succeed a plaintiff must show that the defendant's facially neutral practice has a disparate impact or effect on a protected group: here, women. See, e.g., Shuford v. Ala. State Bd. of Educ., 968 F. Supp. 1486, 1500 (N.D. Ala. 1997). Mercer and Ross also agree (Mot. Summ. J. at 15; Doc. 40 at 14) that a plaintiff must show

the defendant had actual knowledge of the discriminatory effect of its facially neutral rule, yet failed to remedy the violation.  See, e.g., Horner v. Ky. High Sch. Auth., 206 F.3d 685, 692 (6th Cir. 2000).

### 2.    Application

Ross alleges Mercer treats sexual assault complaints differently than any other crime.  Specifically, Ross argues Mercer requires a sexual assault complainant to "prove her allegations" and "come forward and prosecute the crime," requirements that Mercer does not impose upon complainants of other crimes.  Furthermore, since the "majority of sexual assaults and/or rapes are against women," Ross contends, Mercer's policy "has a disparate impact on women . . . the consequence of more women being raped on a college campus." By way of response, Mercer argues Ross has failed to present sufficient facts to prove her case and that Ross's claim is flawed as a matter of law.  As to the former contention, Mercer states Ross failed to introduce any evidence to show Mercer's sexual harassment investigation policy has a disparate impact or effect on women.  As to the latter, Mercer contends Ross failed to prove Mercer intended to discriminate.

The Court finds both of Mercer's arguments persuasive.  Ross has failed to produce any evidence that Mercer's sexual harassment investigation policy has a disparate impact on women, despite her protestations to the contrary.  However, even if the Court were to accept Ross's disparate impact allegations, she still could not prevail on this claim.  Although the Supreme Court has not expressly held proof of intentional discrimination is the *sine qua non* to compensatory relief for a Title IX violation, the Court agrees with the Sixth Circuit's

prediction that the Supreme Court "would likely hold that proof of intentional discrimination is a prerequisite for money damages under Title IX when a facially neutral policy is challenged under a disparate impact theory." Horner, 206 F.3d at 692. Every time it has defined the "contours" of Title IX's "private right of action" to prevent sex discrimination, the Supreme Court has held that the discrimination or violations must be intentional. See Jackson, 544 U.S. at 173-74; see also Cannon, 441 U.S. at 690-93; Franklin, 503 U.S. at 75; Gebser, 524 U.S. at 290-91; Davis, 526 U.S. at 642. Ross has failed to produce any evidence of such a discriminatory intent on Mercer's part. Mercer is entitled to summary judgment on this claim.

### E.    Count 5: Title IX Damages

Ross's fifth Count is merely for damages as a result of Mercer's alleged Title IX violations. Given the Court's finding above that no such violations took place, Mercer is entitled to summary judgment on this claim.

### F.    Counts 6, 7 and 10: State Claims of Negligence, Failure to Provide Adequate Security and Assumption of Duty

Section 1367(c) provides a district court may decline to exercise supplemental jurisdiction over a claim if, among other reasons, it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c) (2006). Having done so in this case, the Court declines to exercise supplemental jurisdiction over Ross's three remaining state law claims, and they are dismissed without prejudice.

### V.    CONCLUSION

66

Mercer's Motion for Summary Judgment (Doc. 34) is granted, Ross's Motion to Strike (Doc. 44) is denied, Ross's Motion to Introduce Evidence from Witnesses Not Previously Identified in Plaintiff's Initial Disclosures (Doc. 45) is denied, and Mercer's Motion to Strike (Doc. 46) is denied

**SO ORDERED**, this the 30th day of March, 2007.


*s/      Hugh Lawson*
**HUGH LAWSON, JUDGE**

pdl